**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Anthony DiCARLANTONIO (88–
3151/3248), and John Prayso
(88–3152/3249), Defendants–Appellants.**

**Nos. 88–3151, 88–3152, 88–3248
and 88–3249.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 30, 1989.

Decided March 17, 1989.

Rehearing and Rehearing En Banc
Denied June 1, 1989.

David L. Shroyer (argued), Columbus, Ohio, for U.S.

Max Kravitz (argued), Columbus, Ohio, for John Prayso.

Before KENNEDY and MILBURN, Circuit Judges, and PECK, Senior Circuit Judge.

KENNEDY, Circuit Judge.

Anthony DiCarlantonio and John Prayso appeal their convictions for conspiracy to violate and actual violation of the Hobbs Act, 18 U.S.C. § 1951. We affirm the conspiracy convictions; but we reverse appellants' convictions for substantive Hobbs Act violations, because the government failed to prove appellants' actions had an effect on interstate commerce.

DiCarlantonio was city attorney of Steubenville, Ohio; Prayso the fire chief. In May 1986, attorney Otto Jack sought DiCarlantonio's interpretation of a local fire ordinance which apparently prevented Jack's client—Jody Glaub—from placing propane tanks within the city limits. Prayso had previously ordered the removal of tanks owned by Glaub's company, Atlas Gas. DiCarlantonio told Jack he would discuss the situation with Prayso.

On May 12, 1986, Jack telephoned DiCarlantonio to check on his progress. DiCarlantonio suggested that Jack give money to the fire chief. Jack balked at the suggestion, protesting that a payoff would be illegal. During this telephone conversation, it was agreed that DiCarlantonio, Prayso, and Jack would meet the following day. At the May 13 meeting, Prayso observed that Glaub could "make a fortune" in the propane business, and said "We should all be on a percentage." Jack reiterated his objection that a kickback would be illegal. The three ultimately decided to reconvene the next day with Glaub in attendance.

Following the May 13 meeting, Glaub and Jack arranged to cooperate with the FBI. On May 14, DiCarlantonio and Prayso promised Glaub a "very reasonable" deal. It was agreed that Glaub would calculate his anticipated profit if the ordinance were changed, and DiCarlantonio and Prayso would receive a cut. On May 20, 1986, DiCarlantonio and Prayso agreed to a $30,000 "fee" for working to change the ordinance. They immediately began lobbying local officials in favor of altering the ordinance, but these efforts did not result in a change in the law.

On May 28, 1986, Glaub delivered $30,000 to DiCarlantonio and Prayso. The bribe money was provided from FBI funds,

not the assets of Jody Glaub or Atlas Gas. Prayso was apprehended the same day with $15,000 stuffed in his socks. DiCarlantonio had a briefcase in his possession when arrested. When questioned by the FBI, DiCarlantonio claimed he did not have the key to the case. Confronted with the fact that the case had a combination lock, he replied that the combination was 1–3–3 and warned that the lock "sticks." Subsequent examination revealed that the combination was 2–2–4 and that the mechanism worked smoothly. The FBI obtained a search warrant, and the case was opened in the presence of DiCarlantonio and his attorney, revealing $15,000 in cash. DiCarlantonio exclaimed, "Oh, how did that get there?"

Prayso and DiCarlantonio claimed that they had been privately investigating Glaub. Unimpressed by this explanation, the jury convicted both defendants. The convictions were reversed on appeal, but after a second trial both were again convicted.

## I.

The principal issue raised by this appeal is whether appellants' conduct constituted a substantive Hobbs Act violation. The Act punishes extortion that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 1951. Appellants contend the government failed to prove that their scheme had any actual impact on interstate commerce. They point out that the flow of natural gas into Steubenville was stemmed not by their illegal acts, but by a preexisting valid ordinance. As for the payment of the bribe, appellants argue this had no effect on interstate commerce because the money came from the FBI, not Atlas Gas.

■ In order to be punishable as a substantive violation of the Hobbs Act, an extortionate scheme must have at least a *de minimis* effect on interstate commerce. *United States v. Harding,* 563 F.2d 299 (6th Cir.1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978). This is not a heavy burden, but we conclude that this is one of the rare cases where a *de minimis* effect on commerce cannot be found.

■ The *de minimis* test clearly would have been satisfied if Glaub had paid the bribe with the assets of Atlas Gas—a business in interstate commerce. However, Glaub used neither his own funds nor those of the company; instead, the bribe money was provided by the FBI. The government now argues that the payment of $30,000 in FBI funds affected interstate commerce by temporarily depleting the funds available to the agency. But while courts have found actual violations of the Hobbs Act where the defendant dealt with an FBI-created business,[1] the mere receipt of government funds has never been enough to establish an actual effect on interstate commerce. In *United States v. Rindone,* the Seventh Circuit held that although receipt of FBI funds was sufficient to establish Hobbs Act jurisdiction for purposes of an attempt charge, "the extortion could not at the moment of the payoff have actually affected commerce." 631 F.2d 491, 494 (7th Cir.1980). This reasoning assumed that the receipt of FBI funds as a bribe had no impact on interstate commerce, and "the corollary of the *Rindone* analysis is that no actual *commission* of Hobbs Act extortion could be charged for the receipt of what were in fact FBI funds." *United States v. Freedman,* 562 F.Supp. 1378, 1383 (N.D.Ill. 1983) (emphasis in original). *Freedman* observed:

> [T]here could be no actual effect on interstate commerce when Rindone obtained FBI dollars, not dollars belonging to interstate enterprise Harper. Thus only the possibility of convicting Rindone for

---

1. *See, e.g., United States v. Frasch,* 818 F.2d 631, 634–35 (7th Cir.1987) (sufficient nexus with interstate commerce where sham FBI enterprise was a purchaser of goods in interstate commerce). *Cf. United States v. Brantley,* 777 F.2d 159, 161–63 (4th Cir.1985), *cert. denied,* 479 U.S. 822, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986) (mere movement of agents and equipment insufficient nexus to interstate commerce where sham FBI operation had no interstate commercial transactions).

an extortion *attempt* under the Hobbs Act obviated the government's need to show an actual effect on interstate commerce....

*Id.* at 1383 (emphasis in original). *See also Brantley,* 777 F.2d at 163 ("[W]e do not think the convictions of the substantive offenses [under the Hobbs Act] may be sustained on the basis of the defendants' mistaken assumption that commerce would be affected.").

The government protests that adopting the *Rindone* analysis would hamper law enforcement by requiring victims to use their own money even when cooperating with the authorities. However, we note that *Rindone* erects no barrier to attempt charges where FBI funds are used, and an attempted violation of the Hobbs Act carries the same potential penalties as a completed one.[2]

Alternatively, the government suggests that the scheme affected interstate commerce by restricting the flow of propane gas. But, in fact, appellants' actions had no effect on the amount of gas permitted in Steubenville. Commerce in propane was limited not by appellants' actions, but by a valid municipal ordinance, which had been enacted before Prayso became fire chief and DiCarlantonio law director. Nor did appellants succeed in increasing the flow of gas. Of course, the success of an extortionate scheme is not ordinarily a prerequisite to a substantive Hobbs Act violation. But in this case, appellants' failure to carry out the objects of the scheme meant that interstate commerce was in no way affected by the scheme. It did not take any funds out of the stream of commerce, nor did it increase or decrease the flow of propane.

## II.

■ Appellants argue that their convictions for conspiracy to violate the Hobbs Act also must be reversed, because it became impossible to complete the violation once the FBI became involved. This argument misapprehends the law of conspiracy. While a substantive Hobbs Act violation requires an actual effect on interstate commerce, a conspiracy charge requires the government to prove only that the defendants' scheme would have affected commerce. "As with other conspiracies, a conviction of conspiring to obstruct commerce in violation of the Hobbs Act may be founded upon proof of an agreement to engage in conduct which would violate the statute." *United States v. Brantley,* 777 F.2d 159, 163 (4th Cir.1985), *cert. denied,* 479 U.S. 822, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986). Thus, the courts have concluded that "factual impossibility is no defense to an inchoate offense" under the Hobbs Act. *United States v. Brooklier,* 685 F.2d 1208, 1217 (9th Cir.1982), *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983). In *Brooklier,* for example, the defendants challenged their Hobbs Act conspiracy convictions on the ground that the business involved had no nexus with interstate commerce because it was an FBI sham. The court rejected this defense, holding that no actual impact on interstate commerce need be shown to sustain a conspiracy conviction. Similarly, the Third Circuit, sitting *en banc,* upheld the Hobbs Act conspiracy convictions of government officials who accepted substantial payments from a fictitious "Arab Sheik," even though the transaction had no actual effect on interstate commerce. *United States v. Jannotti,* 673 F.2d 578 (3d Cir.) (*en banc* ), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). The court observed:

The Hobbs Act, by its own terms, encompasses the inchoate offenses of attempt and conspiracy to extort. Convictions for these offenses have been sustained notwithstanding the absence of any evidence of an actual effect on interstate commerce.

*Id.* at 592.

In the present case, a reasonable jury clearly could have found that appellants

---

**2.** Appellants contend the District Court erred in permitting FBI Agent Chadichimo to testify to the interstate character of the FBI. They assert that this testimony was improper because it permitted the jury to convict on the legally infirm theory that depletion of FBI funds constitutes obstruction of interstate commerce. Since we reverse appellants' convictions for substantive Hobbs Act violations, this is a moot issue.

had conspired to extort money from Glaub and Atlas Gas, and that, if successful, this scheme would have affected commerce by depleting the assets of an enterprise in interstate commerce. Accordingly, the appellants' convictions of conspiracy to violate the Hobbs Act are affirmed.

### III.

Appellant DiCarlantonio asserts that his sixth amendment right to confrontation was violated by the admission of statements by codefendant Prayso. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) held that a defendant's right to confrontation is violated when his nontestifying codefendant's confession implicating him is admitted at a joint trial. The Supreme Court recently held that *Bruton* does not bar the use of a codefendant's confession if it is redacted to omit any references to the defendant's name or existence, even if the codefendant's confession becomes incriminating when linked with other evidence adduced at trial. *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).

In the present case, Prayso's confession was redacted to exclude statements which clearly incriminated DiCarlantonio. The trial court denied severance based on the redaction, and ordered counsel to "request a conference at the bench immediately prior to testimony concerning defendant Prayso's post-arrest statement to assure that all the necessary redactions have been made."

While Prayso's confession was redacted to eliminate any direct references to illegal acts by DiCarlantonio, it was not redacted to eliminate "any reference to [his] existence." *Marsh*, 481 U.S. at 200, 107 S.Ct. at 1703. Prayso's statement indicated that the bribery took place in the law director's office and that the law director (DiCarlantonio) was present at the time. Prayso's redacted confession identified DiCarlantonio by name as the law director. Finally, the statement also revealed that while a bribe of $30,000 was agreed upon, Prayso took only $15,000. The statements appear to incriminate DiCarlantonio without linkage to any other evidence. Moreover, the redaction did not exclude mention of DiCarlantonio's name and existence, as *Marsh* appears to require.

However, DiCarlantonio failed to challenge the incomplete redaction before the statements were *admitted*, as required by the trial court's order. Indeed, the most damaging portion of the confession—which named DiCarlantonio and placed him in the office at the time the $30,000 was solicited—was admitted after DiCarlantonio's counsel stated in a bench conference that he did not consider it improper. Even if this action by counsel is not deemed a waiver of any objection, in light of the strength of the evidence of appellant's guilt, any error was harmless. *See Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972) ("The mere finding of a violation of the *Bruton* rule ... does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect ... so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.").

Prayso also raises a *Bruton* issue. He asserts the District Court erred in admitting DiCarlantonio's out-of-court statements concerning the briefcase and its contents. However, these statements did not even hint at Prayso's existence. They were incriminating as to Prayso only when linked with other evidence. Therefore, the admission of DiCarlantonio's statements does not present a *Bruton* problem.

### IV.

On rebuttal, Agent Chadichimo testified that he took DiCarlantonio's briefcase to a locksmith for examination. The locksmith told Chadichimo that the combination to the lock was 2–2–4, not 1–3–3 as DiCarlantonio first told the authorities. Chadichimo also testified that the locksmith found that the lock did not stick when the combination 2–2–4 was used. DiCarlantonio argues that this testimony was admitted in violation of Fed.R.Crim.P. 16,

because the results of the locksmith's tests were not revealed to the defendants before trial.

Rule 16 requires the government to disclose the results of tests "intended for use by the government as evidence in chief." Agent Chadichimo's testimony was not part of the government's case in chief; it was offered to rebut defense testimony by Mrs. DiCarlantonio in support of her husband's claim that the lock "sticks." "Rebuttal witnesses are a recognized exception to all witness disclosure requirements." *United States v. Windham,* 489 F.2d 1389, 1392 (5th Cir.1974). Therefore, the District Court did not err in allowing Agent Chadichimo's testimony.

### V.

■ Agent Chadichimo testified that when DiCarlantonio's briefcase was pried open to reveal the $15,000, DiCarlantonio cried "Oh, how did that get there?" DiCarlantonio had been permitted to confer with his attorney subsequent to his arrest, and his attorney was present when the statement was made.[3] He now argues that the trial court erred in not ordering a hearing to determine whether he had been advised of his *Miranda* rights and whether he had voluntarily waived those rights in making the statement, even though he neither requested such a hearing at trial nor moved to suppress the statements before trial as required by Fed.R.Crim.P. 12(b)(3).

Counsel should have raised any objection to this evidence in a pretrial motion to suppress under Rule 12. Appellants' failure to make such a motion constitutes a waiver of any objection. Fed.R.Crim.P. 12(f). *See, e.g., United States v. Ostertag,* 619 F.2d 767, 771 (8th Cir.1980). Moreover, even assuming this evidence should have been excluded, the error was harmless in light of the strong evidence of DiCarlantonio's guilt.

3. Defense counsel did not contest the U.S. Attorney's representation to the trial judge that Di-

### VI.

Appellants' remaining assignments of error are without merit.

The verdicts finding appellants guilty of conspiracy to violate the Hobbs Act are AFFIRMED. Appellants' convictions for completed Hobbs Act violations are REVERSED.

Carlantonio had been informed of his rights.