881 F.2d 1077
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Phillip FRIED (88-5292); Raphael Alonso (88-5449); Phillip
Baxter (88-5450); Chester Barry Gibson (88-5451);
and Benito Alonso, Sr. (88-5518),
Defendants-Appellants.
 Nos. 88-5292, 88-5451, 88-5449, 88-5518 and 88-5450.
 United States Court of Appeals, Sixth Circuit.
 Aug. 7, 1989.
 
 Before WELLFORD and ALAN E. NORRIS, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 Benito Alonso, Sr., his son, Raphael Alonso, Phillip Baxter, Phillip Fried, and Chester Barry Gibson appeal from their convictions on various counts entered pursuant to a jury verdict. They are five of twenty-nine defendants included in a thirty-seven count indictment alleging a number of violations of the controlled substances law.
 
 
 2
 Prior to the trial, one defendant was dismissed and twenty-one others pleaded guilty. Only seven of the defendants were tried. Many of the defendants who pleaded guilty and several unindicted coconspirators testified for the government.
 
 BACKGROUND
 
 3
 The indictment and trial resulted from a wide-ranging investigation of a drug conspiracy involving approximately thirty-six individuals. The ringleader of the conspiracy was Richard Davis who lived in the Louisville, Kentucky area. Pursuant to a plea bargain agreement, he became the principal witness for the government.
 
 
 4
 Testimony indicated that Benito Alonso, Sr. and his sons, Benito Alonso, Jr. (who later pleaded guilty) and Raphael Alonso, lived in the Miami, Florida area. Benito, Sr. resided in the main house at a twenty-acre "ranch" which was the nerve center of an operation that, between 1983 and 1985, provided Davis' Louisville organization with large quantities of marijuana and cocaine. Drivers from the Louisville area picked up marijuana and cocaine at the ranch and drove it back to Louisville.
 
 
 5
 Benito Alonso, Jr. led the Miami operation. Raphael assisted him and was the contact man when Benito Alonso, Jr. was not around. Raphael also traveled with Benito Alonso, Jr. to the Louisville area for the purpose of collecting money and dealing directly with Davis and other members of the Louisville organization. Raphael was convicted of conspiracy and for possessing with intent to distribute marijuana.
 
 
 6
 Benito Alonso, Sr. took care of the ranch, was aware of the storage and sale of the marijuana and cocaine, received money for purchases when his two sons were away, assisted in distributions, and stored a supply in his office from which he sold small amounts from time to time. He was convicted of conspiracy and for possessing with intent to distribute approximately 500 pounds of marijuana.
 
 
 7
 From 1981 through 1986, defendant Gibson, a police officer, stored and distributed marijuana and cocaine for Davis, from both his residence and a tackle and bait shop he owned in the Louisville area. During the period of the conspiracy, he claimed to have the ability to fix cases for members of the Davis organization. At one time, he was paid $15,000 worth of cocaine for his efforts in securing the probation of a driver for the conspiracy. He was convicted of conspiracy and on five other counts for possessing with intent to distribute cocaine and marijuana.
 
 
 8
 Baxter became involved in the conspiracy as a distributor. Between 1983 and September 1986, William Chesher, a government witness, and Baxter exchanged at various times an aggregate of approximately 375 pounds of marijuana. In 1984, when Chesher was to leave the Louisville area for out-of-town employment, he introduced Baxter to Davis. Thereafter, Davis supplied Baxter with both marijuana and cocaine. Baxter also dealt with Roger Dale Curry who ran a "stash house" and distributed cocaine for Davis. Baxter sold Curry approximately fifteen to twenty pounds of marijuana in late 1985 or early 1986. He was convicted of conspiracy and on two other counts for possessing with intent to distribute cocaine and marijuana.
 
 
 9
 The trial court directed a verdict of acquittal on the conspiracy charge against Fried, and ruled that coconspirator hearsay evidence would not be admissible against him under two counts of the indictment which charged him with possessing with intent to distribute cocaine. Fried moved for a mistrial on those counts upon the ground that a curative instruction could not repair the damage caused him by that previously admitted evidence since it would be impossible for the jury to disregard that evidence. Other testimony, however, indicated that he had received large amounts of cocaine from Morris Vahle and Curry, both of whom were members of the conspiracy. Accordingly, the trial court denied the motion but instructed the jury that it "must disregard all hearsay evidence" against him. He was convicted on both counts.
 
 DISCUSSION
 Jencks Act Arguments
 
 10
 The first two issues on appeal raise questions with respect to the application of the Jencks Act (18 U.S.C. Sec. 3500) to several statements of government witnesses. Each statement was summarized on an F.B.I. memorandum of interview Form 302. The Jencks Act has been incorporated without substantive change into Fed.R.Crim.P. 26.2, although customary usage speaks only of the Jencks Act. Under the Jencks Act and Fed.R.Crim.P. 26.2, a government witness is not subject to discovery until the witness has testified on direct examination in the trial of the case.
 
 
 11
 The statement which is then subject to production for examination is "a written statement made by the witness that is signed or otherwise adopted or approved by the witness" or "a substantially verbatim recital of an oral statement made by the witness that is recorded contemporaneously with the making of the oral statement and that is contained in a stenographic, mechanical, electrical, or other recording or a transcription thereof." Fed.R.Crim.P. 26.2(f)(1)-(2). The court may recess the trial for examination of the statement and for preparation for its use in the trial. Fed.R.Crim.P. 26.2(d).
 
 
 12
 Curry pleaded guilty and thereafter testified as a government witness. After his testimony, the trial court denied defendant Fried's motion to produce the F.B.I. Form 302 applicable to Curry. The court refused to make an in camera examination of the materials, apparently relying in part upon representations of the government's attorney, and because Curry's presentence report stated that, upon the advice of his attorney, Curry had declined to discuss the offense with the government and because Curry, at the voir dire hearing on the subject, said that he had never reviewed the documents. It also denied Fried's motion to seal the materials for review on appeal.
 
 
 13
 Fried's argument is well-taken. "A defense motion for production of Jencks material imposes on the trial judge an affirmative duty to conduct a non-adversary hearing, out of the presence of the jury, to ascertain whether documents in the possession of the Government are Jencks Act 'statements.' " United States v. Chitwood, 457 F.2d 676, 678 (6th Cir.), cert. denied, 409 U.S. 858 (1972). Reliance upon representations of the government's attorney, see United States v. Miller, 771 F.2d 1219, 1230 (9th Cir.1985); United States v. Peters, 625 F.2d 366, 370-71 (10th Cir.1980), or upon assertions of the witness whose testimony Fried is sought to impeach, was not warranted. See Campbell v. United States, 365 U.S. 85, 97 (1961).
 
 
 14
 Because the trial court did not augment the record on appeal by inclusion of the materials under seal, we are unable to independently review the issue.
 
 
 15
 Accordingly, since defendant Fried is the only appellant who raised this issue on appeal, we must remand his case for an in camera inspection of the materials and a determination of whether the Form 302 was Jencks material, and if so, whether the court's error in not requiring its production was prejudicial to Fried's cause.
 
 
 16
 Defendants Gibson, Benito Alonso, Sr. and Raphael Alonso contend that the trial court erred in requiring the return of Jencks Act materials concerning other government witnesses, after they were used on cross-examination, and in refusing permission to copy the materials. The court also denied their motion that the statements be made part of the record so that they could raise the issue upon appeal.
 
 
 17
 The general aim of the statute is to restrict the use of Jencks statements to impeachment of a government witness by bringing to the attention of the jury during cross-examination of the witness any variances between his testimony and his pretrial statement. Palermo v. United States, 360 U.S. 343, 352 (1959). Accordingly, we are unable to say that the trial court's restricting the use of the materials to that contemplated by the statute was error. In addition, we note that defense counsel's examination of the statements, has not resulted in a demonstration that their clients were prejudiced by the trial court's action.
 
 Use of Organizational Charts
 
 18
 Benito Alonso, Sr. and Phillip Baxter contend that the district court erred in denying motions seeking to prohibit the government from using an exhibit consisting of a two-part, three-by-five-feet chart depicting the organization of the conspiracy.
 
 
 19
 The first part was entitled "Cocaine and Marijuana Louisville Distribution Group." A circle underneath the title included the name of Richard Davis, the conspiracy's ring leader, in prominent capital letters, with the names of his two partners underneath in small capitals. The chart displayed, in separate block columns, the names of five drivers/distributors, three "stashers," and fourteen distributors. Defendants Baxter, Gibson, and Fried were listed as distributors. The two Alonso appellants were not listed on this part.
 
 
 20
 The second part contained four columns listing the names of thirty-two members of the conspiracy, the function of each, the dates he was involved, and the specific acts he committed. The court, when proper objection was interposed, required the chart to be turned away from the jury, but initially overruled an objection that the use of the chart during the interrogation of government witnesses would be unfairly suggestive and leading. The chart was not introduced into evidence. Defendants did not request a specific cautionary jury instruction and none was given.
 
 
 21
 Defendants contend that the use of the chart was prejudicial because it unfairly applied labels to the appellants, was used as a substitute for the witnesses' independent recollections, was used by the prosecution to lead government witnesses, and served to place the defendants in specific illegal roles.
 
 
 22
 Use of a chart in opening statement is generally permissible, since it is not evidence, and as the purpose of the opening argument is to give a broad outline of the case and facts to be proved, a visual outline of a party's argument is not significantly different from an oral outline. A chart, like an opening statement, must avoid reference to matters that cannot be proved or would be inadmissible as evidence. United States v. De Peri, 778 F.2d 963, 978-79 (3d Cir.1985), cert. denied sub nom, Murphy v. United States, 475 U.S. 1110 (1986). The use of charts in a complex conspiracy case can significantly assist the jury.
 
 
 23
 Use of charts as demonstrative devices, whether in argument or during trial is well within the trial judge's discretion. See United States v. Possick, 849 F.2d 332, 339 (8th Cir.1988), cert. denied, 57 U.S.L.W. 3842 (1989). Even though not introduced as evidence, charts may be used
 
 
 24
 as pedagogical devices to summarize or organize testimony or documents which have themselves been admitted in evidence. Courts have permitted the use of this latter type of exhibit as an aid to the fact-finder in cases involving complicated or voluminous evidence, provided that it does not mislead the jury by unfairly emphasizing parts of the proponent's proof or creating the impression that the facts underlying the summary or chart, if disputed, have been conclusively established.
 
 
 25
 5 J. Weinstein and M. Berger, Weinstein's Evidence Sec. 1006 (1988) (emphasis deleted). If requested, guarding instructions must be given that a chart is not itself evidence but is only an aid in evaluating the evidence. United States v. Scales, 594 F.2d 558, 564 (6th Cir.), cert. denied, 441 U.S. 946 (1979). The trial court must take care that unfair summaries or charts are not presented to juries. Id.
 
 
 26
 Defendants have not demonstrated that the chart contained any unfair, unproved, inadmissible, inaccurate, irrelevant, misleading, or confusing matters, nor can we see any prejudice resulting to them from its use other than the fact that it may have accomplished its purpose of preventing the jury from being confused in following the government's presentation of this complex case. It would not have been possible for a juror, mindful of the general instructions as given, to have considered this chart as evidence. The jury acquitted the defendant Thomas Alexis Simpson despite the fact that his name also appeared on the chart. Accordingly, the trial court did not abuse its discretion in permitting use of the chart.
 
 Willful Blindness Instruction
 
 27
 Benito Alonso, Sr. argues that the court erred in instructing the jury that
 
 
 28
 the element of knowledge or knowingly may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him. The finding beyond a reasonable doubt of a conscious purpose to avoid enlightenment would permit an inference of knowledge. Put another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact.
 
 
 29
 He complains that the instruction was inconsistent with other portions of the instructions that required proof beyond a reasonable doubt that a defendant was a knowing participant and had willfully participated in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy. He contends that the instruction permitted the jury to infer, not merely that he had knowledge, but also that, contrary to the evidence, he was a willful participant.
 
 
 30
 As Benito Alonso, Sr. did not object to the instruction, in the absence of plain error, he is precluded from raising the issue on appeal. Fed.R.Crim.P. 30; Fed.R.Crim.P. 52(b); see United States v. Word, 806 F.2d 658, 665 (6th Cir.1986), cert. denied, 480 U.S. 922 (1987).
 
 
 31
 Criminal defendants may not escape liability by deliberately closing their eyes to what would otherwise be obvious to them or by acting in reckless disregard of, or with a conscious purpose to avoid learning the truth. United States v. Gullett, 713 F.2d 1203, 1212 (6th Cir.1983), cert. denied, 464 U.S. 1069 (1984); United States v. Seelig, 622 F.2d 207, 213 (6th Cir.), cert. denied, 449 U.S. 869 (1980). The instruction, in the context of all of the instructions given to the jury, was not erroneous. Further, our review of all of the evidence in the record confirms that the trial court was correct in ruling that the evidence against Benito Alonso, Sr. was sufficient to support a finding of guilt by participation.
 
 Voir Dire
 
 32
 Raphael Alonso objects to the trial court's denial of his request that prospective jurors "be questioned as to their bias against Miami Cubans with an imperfect command of the English language." He claims the error was prejudicial because it affected his ability to use his peremptory charges effectively. On voir dire, the trial court stated:
 
 
 33
 Now, in this case two of the defendants are Hispanic. Does any member of the p anel have any--I don't like to say prejudice, but I don't know any other word fo r it--any prejudice against Hispanics, whether or not they are citizens of this country? I take it by your silence none of you feels that way.
 
 
 34
 Raphael's counsel objected to the instruction and asked the court that "it be discussed about being Cuban as opposed to simply Hispanic." The court overruled the objection.
 
 
 35
 The court's question was comprehensively designed to reveal any prejudice based upon either Hispanic origin or citizenship. A juror prejudiced against Cubans unable to speak perfect English could not have answered "no" truthfully. In the absence of any demonstration to the trial court that racial or citizenship issues were inextricably bound up with the conduct of the trial or of other special circumstances requiring a more specific question, the trial court did not abuse the broad discretion given to it in conducting voir dire. Rosales-Lopez v. United States, 451 U.S. 182, 188-92 (1981). There was no "constitutionally significant likelihood that, absent questioning" about non-citizen Cubans with imperfect speech, "the jurors would not be as 'indifferent as [they stand] unsworne.' " Ristaino v. Ross, 424 U.S. 589, 596 (1976) (quoting Coke on Littleton 155b (19th ed. 1832).
 
 Sentence of Raphael Alonso
 
 36
 The trial court sentenced Raphael Alonso to serve three concurrent ten-year terms on his convictions for conspiracy, possessing with intent to distribute approximately 500 pounds of marijuana, and possessing with intent to distribute approximately two tons of marijuana. The sentences were to be served consecutively with a previous sentence imposed pursuant to his conviction, in 1987, on marijuana charges based on activities occurring in 1980. He was also sentenced to a total special parole term of three years. The court noted that, although Benito Alonso, Jr. was the principal manager of the conspiracy, the testimony indicated that when he was not available, people dealt with Raphael and that Raphael had made trips to California, Chicago, and Louisville on several occasions in furtherance of the conspiracy.
 
 
 37
 Raphael contends that the sentence was improper, under the sentencing procedures then applicable to his conduct, because he played a peripheral, and not a managerial, role in the conspiracy; did not receive substantial proceeds from it, as evidenced by the fact that he worked to support his family, rather than living off income from the conspiracy; and played no role in planning, financing, or procurement in the Davis organization. However, the trial court found that "to say that he was not a manager is not reality."
 
 
 38
 A sentencing decision by a district judge is unreviewable if it is within the statutory limits, except in the case of reliance upon erroneous or improper factors or information in sentencing so as to amount to a gross abuse of discretion, a failure to evaluate the sentencing information submitted, or a total failure to exercise discretion. United States v. Barbara, 683 F.2d 164, 166 (6th Cir.1982). Raphael's sentence was well under the statutory limits and the evidence supports the trial court's determination that Raphael was a manager. Accordingly, the sentence was properly imposed.
 
 
 39
 Mistrial After Fried's Conspiracy Acquittal
 
 
 40
 In denying Fried's motion for a mistrial on the possession with intent to distribute counts, the court stated that it was convinced that it could tailor an instruction that would shield him from the prejudicial effect of coconspirators' hearsay statements which had been admitted in the conspiracy case previous to his acquittal on that count. Fried argues that, in view of the nature of the evidence in this record, no reasonable person could be convinced that jury instructions would shield him from prejudice.
 
 The court's instruction read:
 
 41
 The Court has determined as a matter of law that the defendant Fried was not a participant in the conspiracy and during this trial there have been various statements offered in evidence against the defendant Mr. Fried. The Court initially allowed you to hear that hearsay testimony because of the allegation in the indictment that he had acted as a part of the conspiracy. Since there is insufficient evidence of defendant Fried's guilt of any conspiracy and he has been acquitted on the charge of conspiracy, you must disregard all hearsay evidence while determining his guilt or innocence on the remaining counts.
 
 
 42
 (Emphasis added.) The court had previously instructed the jury concerning the use of statements and acts by a member of the conspiracy that occurred in the absence and without the knowledge of a particular defendant.
 
 
 43
 Fried did not object to the instruction nor does he raise an issue here with respect to its being erroneous.
 
 
 44
 Since Fried failed to object to the instruction, or to attempt to assist the court in its effort to prepare a proper instruction, we must assume without deciding that, apart from the question of whether any instruction would be effective, this instruction was appropriate.
 
 
 45
 Our review of the evidence in the record, other than the coconspirators' statements, indicates that the direct testimony of Curry, Morris Wayne Vahle, and Charles Wallace was clearly substantial evidence sufficient to support the jury verdict. We see no rational basis for a conclusion that the jury might have disbelieved their testimony if the coconspirators' extrajudicial statements had never been introduced into the record. This is not a case where, as in United States v. Lucido, 486 F.2d 868, 869-70 (6th Cir.1973), the inadmissible testimony was the basic element in the evidence against the defendant.
 
 
 46
 Further, any potential hearsay prejudice to Fried arising from the extrajudicial statements about him attributed by government witnesses to coconspirators Curry, Vahle, and Davis and the extrajudicial activity involving him attributed by government witnesses to Wallace, must be evaluated in the light of the fact that Curry, Vahle, Davis, and Wallace testified at the trial and were subject to cross-examination.
 
 
 47
 Pretrial Motion for Exclusion of Misdemeanor Conviction
 
 
 48
 The district court denied Fried's pretrial motion that the government not be permitted to introduce evidence of his 1981 misdemeanor conviction on a marijuana charge. Fried claims that the conviction was inadmissible either as impeachment evidence under Fed.R.Evid. 609(a) or as bad acts evidence under Fed.R.Evid. 404(b).
 
 
 49
 To raise and preserve for review a claim of improper impeachment with a prior conviction under Rule 609(a), a defendant must testify. "Only in this way may the claim be presented to a reviewing court in a concrete factual context." Luce v. United States, 469 U.S. 38, 43 (1984) (quoting Justice Powell's concurring opinion in New Jersey v. Portash, 440 U.S. 450, 462 (1979)).
 
 
 50
 Other circuits have extended the rule of Luce to apply to motions in limine based upon Rules of Evidence other than Rule 609(a). United States v. Griffin, 818 F.2d 97, 102-06 (1st Cir.1986), cert. denied, 108 S.Ct. 137 (1987). The need for the full development of an adequate record for purposes of appellate review is even more compelling in the case of alleged potential improper use of Rule 404(b) evidence. United States v. Ortiz, 857 F.2d 900, 905-06 (2d Cir.1988), cert. denied, 109 S.Ct. 1352 (1989).
 
 
 51
 Accordingly, the court properly denied the motion.
 
 
 52
 Sufficiency of the Evidence Against Defendant Baxter
 
 
 53
 Defendant Baxter argues that the trial court erred in denying his motion for judgment of acquittal. He argues (1) that the evidence was insufficient to convict him under Count 10 of possessing one kilogram of cocaine with intent to distribute, because there was no proof that the package he received weighed one kilogram or contained cocaine; (2) that the evidence was insufficient to convict him under Count 29 of possessing 375 pounds of marijuana with intent to distribute, because the proof did not establish that the substance he received was marijuana and because, although the indictment charged only one transaction, the evidence showed that he had handled an aggregate amount in a series of transactions; and (3) that, since the evidence was insufficient on those counts, it was also insufficient to prove that he was a participant in the conspiracy.
 
 
 54
 In reviewing a denial of a motion for judgment of acquittal, an appellate court must view the evidence and the inferences drawn therefrom in the light most favorable to the government, United States v. Schultz, 855 F.2d 1217, 1221 (6th Cir.1988), and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 55
 After careful review of the entire record, we conclude that the jury verdict against Baxter is supported by substantial evidence. The evidence supports a finding that he and government witness Chesher exchanged approximately 375 pounds of marijuana in the aggregate during the period from 1983 to September of 1986, and that he also made several purchases of marijuana from Davis. There was sufficient direct and circumstantial evidence from which the jury could find beyond a reasonable doubt that the substances were cocaine and marijuana. United States v. Schrock, 855 F.2d 327, 332-36 (6th Cir.1988). Proof of possession of a controlled substance and that the amount is measurable is sufficient to convict a defendant of possession with intent to distribute in violation of 21 U.S.C. Sec. 841(a)(1). It is unnecessary to establish the precise amount. United States v. Woods, 568 F.2d 509, 512 (6th Cir.), cert. denied, 435 U.S. 972 (1978). Finally, "conviction of conspiracy under 21 U.S.C. Section 846 does not require proof of an overt act." Schulz, 855 F.2d at 1222.
 
 Chain of Custody of Cocaine Package
 
 56
 Wilmer Kiser, forensic chemist supervisor in the Drug Enforcement Administration laboratory in Miami, Florida, testified that his analysis of government Exhibit 21 revealed 1,997 grams of powder which was ninety-four percent cocaine hydrochloride.
 
 
 57
 Baxter objected to Kiser's foundation testimony, which described the general procedures followed by the laboratory when police brought sealed packages, accompanied by the necessary paperwork requesting an analysis, to the laboratory. Kiser testified that an evidence consultant assigned a laboratory control number to the evidence, routed the paperwork to the supervisory chemist, and put the sealed package into a vault. The supervisor then routed the paperwork to a forensic chemist assigned to analyze the substance, who would retrieve the evidence from the evidence custodian, analyze it, and return it. He further testified that this procedure was followed with respect to Exhibit 21.
 
 
 58
 Baxter objected upon the ground that Kiser did not have personal knowledge that all of the procedures were followed and now urges, on appeal, that the government has failed to prove a chain of custody insuring that the sample analyzed was from the same sample taken by the police and not from some other sample.
 
 
 59
 Boiled down, Baxter's objection is simply that other persons, in addition to Kiser, should have been produced to testify with respect to the integrity of the chain-of-custody process prior to Kiser's taking possession of the packet. However, other evidence in the chain of custody, if believed by the jury, leaves no room for doubt that the sample seized was the sample analyzed or that other persons would not have substantiated Kiser's testimony. Trial testimony established the identity of the packet as that sealed at the time of its seizure and thereafter introduced, having been only opened once, for the purpose of Kiser's test, and resealed. Fed.R.Evid. 901(a).
 
 
 60
 In any event, the government need not prove a perfect chain of custody. Gaps in the chain affect the weight of the evidence and not its admissibility. There is no rule that the government must provide the testimony of all of the persons who have had custody of the evidence. United States v. Cardenas, 864 F.2d 1528, 1531 (10th Cir.), cert. denied, 57 U.S.L.W. 3827 (1989). Physical evidence is admissible where the possibilities of misidentification or alteration are eliminated, not absolutely, but as a matter of reasonable probability. United States v. McFadden, 458 F.2d 440, 441 (6th Cir.1972), cert. denied, 410 U.S. 911 (1973).
 
 
 61
 The court did not abuse its discretion in admitting this evidence.
 
 
 62
 Gibson's Motion to Suppress Incriminating Statements
 
 
 63
 During the trial, Detective William L. Farmer testified that defendant Gibson had signed a written confession admitting his guilt. The confession was introduced as evidence against him and the other defendants. Gibson's former counsel failed to file a Rule 12 motion to suppress the confession. The trial court denied motions, filed by new counsel who entered his appearance on the first day of the trial, for a continuance or severance and for a hearing on the issue of the voluntariness of the statements. Farmer's testimony clearly indicated that Gibson was informed of his constitutional rights and voluntarily signed waivers of those rights.
 
 
 64
 Timely failure to file a pretrial motion to suppress evidence, as required by Fed.R.Crim.P. 12(b)(3), constitutes a waiver, under Fed.R.Crim.P. 12(f), unless the court for good cause grants relief from the waiver. United States v. DiCarlantonio, 870 F.2d 1058, 1062 (6th Cir.1989). The rule is not a "narrow, finicky procedural requirement," but reflects "an important social policy." United States v. Worthington, 698 F.2d 820, 822-24 (6th Cir.1983), cert. denied, 469 U.S. 827 (1984) (quoting Jones v. United States, 362 U.S. 257, 264 (1960)). In the absence, at a minimum, of a good faith showing of evidence of involuntariness sufficient to establish a good cause for granting relief from the waiver and a further showing that a hearing would not have disrupted this complex trial, the court did not abuse its discretion by denying the motion for a hearing. "[C]ourts are understandably reluctant to grant relief except in unusually meritorious cases for untimely motions under Rule 12(f)." United States v. Mangieri, 694 F.2d 1270, 1283 (D.C.Cir.1982).
 
 
 65
 Gibson's reliance upon United States v. Bentley, 726 F.2d 1124 (6th Cir.1984), is misplaced since there is no evidence or proffer of evidence in the record that "clearly reflects a question" about the voluntary nature of his statements. Bentley, 726 F.2d at 1128.
 
 
 66
 Extrajudicial Statements Supporting Gibson's Arrest
 
 
 67
 The court, over the objection of all of the defendants, permitted Detective Farmer to testify that his investigation focused on Gibson immediately after Davis began to cooperate with the government. He said that the reason for the investigation was that an "allegation had surfaced that a member of the Jefferson County Police Department was on the take" with Gibson. Farmer also responded affirmatively to questions asking whether he had received information that Gibson was a drug dealer and whether "[b]ased on that information, was an arrest warrant issued by the magistrate for Mr. Gibson's arrest." He also testified that Lieutenant Fox was assigned to assist him "on the investigation concerning the allegations of a dirty policeman." The declarants who provided the allegations and information were not disclosed.
 
 
 68
 The court admitted the evidence upon the basis that it was not offered for the truth of what Detective Farmer had heard but to establish why he did what he did. No cautionary instruction was given or requested. Neither was any objection raised, under Fed.R.Evid. 403, that its probative value was outweighed by its potential harm.
 
 
 69
 The unknown declarants' statements were offered in evidence to lay a foundation for the introduction of Gibson's statements into evidence as having been given voluntarily after notice and waiver of his constitutional rights. Obviously, the lawfulness of his arrest had to be established.
 
 
 70
 Accordingly, the statements do not fall within the definition of hearsay in Fed.R.Evid. 801(c): " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."
 
 
 71
 "[O]ut of court statements are not hearsay when offered for the limited purpose of explaining why a Government investigation was undertaken." United States v. Freeman, 816 F.2d 558, 563 (10th Cir.1987). However, they "must be evaluated under the criteria in Fed.R.Evid.Rules 401 and 403 for relevance and to prevent confusion or prejudice on the part of the jury." Id.
 
 
 72
 In addition, our review of the entire record indicates that the potential unfairly prejudicial value of the statements did not outweigh their probative value, since Gibson's confession, as well as other evidence, confirmed the truth of the allegations and his drug dealings were established by the direct testimony of government witnesses.
 
 
 73
 Reply Brief Issue of Newly-Discovered Evidence
 
 
 74
 Defendant Baxter, in his reply brief, raises an issue with respect to his alleged discovery for the first time, on December 8, 1988, of evidence indicating that his codefendant, Gibson, was in fact a participant informant for the government. Defendant Fried has also raised the issue in his reply brief and incorporated Baxter's arguments by reference. The government has filed a motion to strike the issues from both briefs.
 
 
 75
 The government's motion to strike the issues from both briefs is well taken. The proper procedure for dealing with newly-discovered evidence, even when an appeal is pending, is to file a motion for a new trial in the district court. The district court may request the appellate court to remand for the purpose of consideration of the motion. Fed.R.Crim.P. 33; United States v. Cronic, 466 U.S. 648, 666 n. 42 (1984). The motion must be filed within two years after the final judgment of the district court or the mandate of affirmance by the appellate court. See generally 3 C. Wright Federal Practice and Procedure Secs. 557-59 (1982).
 
 
 76
 The judgments of conviction against defendants Raphael Alonso (Case No. 88-5449), Phillip Baxter (Case No. 88-5450), Chester Barry Gibson (Case No. 88-5451), and Benito Alonso, Sr. (Case No. 88-5518) are affirmed. Case No. 88-5292, the appeal of Phillip Fried, is remanded to the district court for the in camera inspection and determination called for by this opinion.