**PUBLISH**

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 95-4908
_____

D. C. Docket No. 94-422-CR-SH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BARRY KAPLAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

**(January 22, 1998)**

Before ANDERSON and BIRCH, Circuit Judges, and WOODS,[*] Senior
Circuit Judge.

_____

[*] Honorable Henry Woods, Senior U.S. District Judge for the
Eastern District of Arkansas, sitting by designation.

BIRCH, Circuit Judge:

This case requires us to determine whether a potential transfer of funds from a point outside the United States to a point inside a State, for the purpose of paying an extortion demand, establishes an effect on commerce sufficient to support federal jurisdiction under the Hobbs Act. See 18 U.S.C. § 1951. The district court held, and the government contends on appeal, that the simple payment of an extortion demand in interstate commerce, without any further effect on commerce, is sufficient to support a conviction under the Hobbs Act. We REVERSE.

## BACKGROUND

In 1984 and 1985, defendant-appellant, Barry Kaplan, a resident of Miami, Florida, placed several hundred thousand dollars into two Panamanian bank accounts with the assistance of Pablo Arosemena, a Panamanian lawyer. Kaplan also gave Arosemena power of attorney over the two bank accounts for the ostensible purpose of disguising his ownership of the money and thus evading

taxation in the United States. Thereafter, Kaplan sought access to those funds, but Arosemena refused to return the money. In January 1989, Kaplan met with Arosemena in his Panamanian office, where Kaplan claims Arosemena admitted that he had stolen the money. Kaplan also contends that Arosemena brandished a firearm during their conversation as he asked Kaplan what he was going to do about the theft.

Kaplan consulted another Panamanian lawyer, Mario Fonseca, to attempt to recover his money. Fonseca conducted an investigation into the matter and confirmed that Arosemena had stolen the money from the Panamanian accounts. When Fonseca met with Arosemena, Arosemena refused to deny the theft and warned Fonseca that he would report Kaplan's off-shore funds to the United States Internal Revenue Service if Kaplan pursued the matter. Fonseca immediately communicated this threat to Kaplan by letter, calling Arosemena's tactics "blackmail."

Fonseca testified that Kaplan could have brought a civil suit against Arosemena or sought criminal charges against him in Panama.[1] Fonseca explained, however, that a civil suit would have served no purpose because Arosemena claimed to have no assets. Moreover, as a criminal prosecution certainly would have caused Arosemena to lose his license to practice law, thereby eliminating his primary means of earning money, any such course of action also would have defeated Kaplan's objective of repayment.

Next, Kaplan discussed his predicament with Roy Gelber, then a Dade County Circuit Judge. Gelber had served as Kaplan's lawyer on another matter while he was still in private practice. Gelber volunteered to contact Raymond Takiff, a Florida lawyer who had represented General Manuel Noriega, then the de facto leader of Panama. Kaplan, Gelber, and Takiff began to discuss this matter in June 1989 and continued until the early part of 1990. Neither

---

[1] Fonseca hired another Panamanian lawyer, Dr. Rafael Rodriguez, to prepare a civil suit against Arosemena but Kaplan decided not to pursue it.

4

Kaplan nor Gelber, however, were aware that Takiff had begun to cooperate with the federal government in an attempt to resolve his own criminal problems. Takiff became an informant for the government on or about August 4, 1989, and he began to record his conversations with Kaplan and Gelber.[2] During these conversations, Takiff offered to contact high ranking individuals in the Panamanian Defense Forces ("PDF") who could retrieve the money from Arosemena in Panama. Although Takiff stated that his contacts would not kill Arosemena, the record shows that he expected those contacts to resort to violence or the threat of violence to obtain the money. On September 7, 1989, Takiff explained to Gelber and Kaplan that PDF soldiers would force Arosemena to sign cards to withdraw approximately $300,000 from a Panamanian bank account.

---

[2] Takiff's cooperation with the federal government was not limited to Kaplan's case. Takiff played a part in "Operation Courtbroom," an investigation into judicial corruption in Dade County. Takiff engaged in a series of secret transactions with Gelber in the course of this operation and Gelber eventually pled guilty to charges based on his acts of judicial corruption. Pursuant to his plea agreement, Gelber testified against Kaplan at trial.

Kaplan agreed to the details of the plan and was aware that violence would play a part in the transaction.

Kaplan also decided that he would receive the money by accepting a check, in Florida, payable to a Bahamian attorney and referenced to another off-shore bank account. Although the transaction never took place, it is clear that Kaplan sought access to these funds because he had exhausted his personal assets and the record supports the inference that he would have made some attempt to use the money in Florida. Moreover, the record establishes that Gelber and Takiff were to receive a portion of the extortion demand as payment for their efforts.

Kaplan, appeals his conviction for attempted extortion and conspiracy to commit extortion under the Hobbs Act and argues that the evidence the government presented at trial was insufficient to show any effect on commerce as contemplated by the statute. Kaplan presented this issue to the district court in a motion for a judgment of acquittal and new trial pursuant to Fed.

R. Crim. P. 29(a) & 33, but the district court denied relief. Although Kaplan challenges his conviction on a number of additional grounds, since we hold that the district court erred by finding an effect on commerce on the facts of this case, we limit our discussion to that issue.

## DISCUSSION

The Hobbs Act provides for the federal prosecution of a defendant who attempts or conspires to extort property in a manner that obstructs or affects commerce. <u>See</u> 18 U.S.C. § 1951(a).[3] The language of the statute, as well its historical context, demonstrate that Congress did not intend to transform every extortionate

---

[3]  The Hobbs Act provides in pertinent part:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do . . . shall be fined under this title or imprisoned not more than twenty years, or both.
> (b) As used in this section–
> . . . .
> > (3) The term "commerce" means . . . all commerce between any point in a State . . . and any point outside thereof . . . and all other commerce over which the United States has jurisdiction.

18 U.S.C. § 1951.

7

transaction into a federal crime. Instead, the Hobbs Act applies only to those extortionate acts that affect interstate commerce. See generally United States v. Staszcuk, 517 F.2d 53 (7th Cir. 1975) (en banc) (providing an excellent history of the Hobbs Act). As a result, the government must prove both extortion and an effect on commerce as the two essential elements of a Hobbs Act crime. See Stirone v. United States, 361 U.S. 212, 218, 80 S. Ct. 270, 274, 4 L. Ed. 2d 252 (1960) ("The charge that interstate commerce is affected is critical since the Federal Government's jurisdiction of this crime rests only on that interference."). Although the Hobbs Act's definition of commerce is intended to be broad, and we have held that the required effect on commerce need only be minimal, some effect on commerce nevertheless must exist to support federal jurisdiction. See United States v. Castleberry, 116 F.3d 1384, 1386 (11th Cir.) (reaffirming that the government need only show that "the extortionate activity has a minimal effect on interstate commerce . . . ."), cert. denied, __U.S. __, 118 S. Ct. 341 (1997).

8

Kaplan argues that the government failed to provide evidence of how the extortion scheme in which he was involved could have produced an effect on commerce sufficient to support his conviction under the Hobbs Act. In reviewing the sufficiency of the evidence, we "consider the evidence in the light most favorable to the Government and draw all inferences and credibility choices in favor of the jury's verdict." Id. at 1387-88. We, therefore, must affirm Kaplan's conviction if any reasonable construction of the evidence would have permitted the jury to find guilt beyond a reasonable doubt. See id. at 1388. As the courts have recognized, however, proving an effect on commerce when an individual rather than a business entity is the target of the extortion is no simple matter. See United States v. Collins, 40 F.3d 95, 99-100 (5th Cir. 1994).[4]

---

[4]  The Collins court held that:

> Criminal acts directed towards individuals may violate section 1951(a) only if: (1) the acts deplete the assets of an individual who is directly and customarily engaged in interstate commerce; (2) if the acts cause or create the likelihood that the individual will deplete the assets of an entity engaged in interstate commerce; or (3) if the number of individuals victimized or the sum at stake is so large that there will be some

The government advances two theories to support the conclusion that Kaplan's plan, if completed, would have affected interstate commerce. First, the government argues that it has satisfied the Hobbs Act's jurisdictional prerequisite because if Kaplan's extortion demand had been successful the ensuing transfer of money from Panama to Florida would have constituted a transaction in interstate commerce.[5] In direct support of the government's argument, the Hobbs Act specifically defines commerce to include "all commerce between any point in a State . . . and any point outside thereof . . . ." 18 U.S.C. § 1951(b)(3). Nevertheless, the government has cited no case in which the victim's payment of an extortion demand, standing alone, provided

---

"cumulative effect on interstate commerce."

Collins, 40 F.3d at 100 (footnotes and citations omitted). The government has made no argument with regard to the first two possibilities.

[5] Although the parties vigorously contest whether the government presented evidence that the money would have ever entered the United States, for the purposes of this appeal we assume, as we must, that the jury inferred that Kaplan, Gelber, or Takiff would have received money in Florida. See Castleberry, 116 F.2d at 1387-88.

the effect on commerce necessary to support a conviction under the Hobbs Act.  The typical Hobbs Act case involves some element of commerce independent and apart from the transaction of paying an extortionist's demand.  Indeed, the courts have gone to great lengths to identify how a defendant's actions affected that independent, preexisting commerce, rather than looking to the form of the extortion payment.  See, e.g., United States v. Hollis, 725 F.2d 377, 380 (6th Cir. 1984) (basing jurisdiction on a preexisting interstate contract between the parties rather than on the movement of the extorted funds across state lines).  This approach is consistent with the language of the Hobbs Act, which criminalizes extortion that "obstructs, delays, or affects" commerce rather than extortion that itself constitutes commerce.   18 U.S.C. § 1951(a).   Congress enacted the Hobbs Act (and its statutory predecessor) to "eliminate the 'levy of blackmail upon industry'" and therefore intended the statute to "remove artificial restraints on the free flow of goods." Staszcuk, 517 F.2d at 57, 58.   This legislative emphasis on

11

protecting industry and business explains the judicial focus on the victim's connection to interstate commerce rather than the form or structure of the extortion payment.

The government's argument, however, would require that we extend the Hobbs Act to every act of extortion that constitutes an interstate commercial transaction.  Although we do not doubt that Congress has the power to make the receipt of an extortion payment across a State border a federal crime, cf. Castleberry, 116 F.3d at 1387 (discussing the impact of United States v Lopez, 514 U.S. 549, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995), on the Hobbs Act's jurisdictional requirements), the language and history of the Hobbs Act does not indicate that Congress intended this statute to perform any such function.[6]

---

[6]    Our own research has uncovered only two cases that even suggest that the Hobbs Act applies to a case in which the victim's payment of an extortion demand would constitute the only nexus to interstate commerce.  In United States v. Blair, a district court toyed with the idea that: "An individual may be extorted in a manner which affects interstate commerce if the actual extortionate payment forces the individual to perform a direct interstate transaction." 762 F. Supp. 1384, 1389-90 n.7 (N.D. Cal. 1991) (citing United States v. Hoelker, 765 F.2d 1422 (9th Cir. 1985) (per curiam)).  For the reasons discussed above, we find that the Blair court's reasoning on this point and its reading of Hoelker,

The government's contention that <u>United States v. Davis</u>, 707 F.2d 880 (6th Cir. 1983), supports its theory of jurisdiction is unpersuasive. In that case, the defendant, an elected sheriff in Ohio, required his deputies to make monthly contributions to his political war-chest and perform construction work at his home to ensure their continued employment. Some of these deputies were receiving funds under federal programs, and the evidence showed that some of this money was diverted to make contributions to the sheriff. The Sixth Circuit held that this diversion of funds in interstate commerce supported jurisdiction under the Hobbs Act. <u>Id.</u> at 884. In <u>Davis</u>, however, the court focused, not on the actual payment of the extortion demand to the sheriff (which by all indications would have been an intrastate transaction), but on the preexisting,

which decides only that the McCarran-Ferguson Act does not take an insurance contract out of interstate commerce, to be seriously flawed. Similarly, in <u>Hollis</u>, 725 F.2d at 380 n.5, the court mused in <u>dicta</u> that the payment of an extortion demand might be sufficient to "affect commerce" when the defendant immediately took the money across state lines. Subsequent courts, however, have rejected such an approach. <u>See, e.g.</u>, <u>Collins</u>, 40 F.3d at 99 (finding that the movement of robbery proceeds across state lines was insufficient to affect commerce within the meaning of the Hobbs Act).

independent commerce that the extortion affected: the payments to the deputies.[7] In this case, however, there was no diversion of funds already in independent interstate commerce because the victim had secured them for his personal use in a Panamanian bank account.[8] Since we have found no support for the contention that the federal government can establish jurisdiction under the Hobbs Act by relying solely on the flow of the extortion payment itself through interstate commerce, we refuse to expand the scope of the Hobbs Act to affirm the conviction in this case.

Second, the government asserts that federal jurisdiction is appropriate because, once the funds arrived in Florida, Kaplan and his co-conspirators reasonably could have been expected to use

---

[7] The government attempts to bolster this argument by citing United States v. Huynh, 60 F.3d 1386, 1388-89 (9th Cir. 1995), in which the defendant threatened to interrupt her victims' supplemental security income ("SSI") payments, which traveled from Alabama to Washington state, if the victims refused to pay her and buy her gifts. By now it should be clear that, on the facts of the Huynh case, the defendant's conduct affected independent, preexisting interstate commerce (the government's payment of SSI benefits), an element that is missing from this case.

[8] The victim's withdrawal of the funds from a bank account also fails to provide the required connection to interstate commerce. See Blair, 762 F. Supp. at 1393-94 (collecting cases).

14

that money in interstate commerce. Although the government's

argument does identify a reasonably probable effect on commerce

as a result of the extortion scheme,[9] it proves too much. Given the

state of the modern national and international economy, in which

almost anyone can purchase goods from distant corners of the

globe, the government's theory would make the Hobbs Act

ubiquitous by supporting a federal prosecution in any case in which

a defendant extorted any amount of money. Moreover, the

government's argument receives virtually no support in the cases.

Although a few courts have suggested that the sheer size or scope

of an extortion plot might provide the required effect on

---

[9] The government's theory might be considered the converse of the "depletion of assets" theory, which has supported the federal prosecution of defendants whose extortion produced only an indirect effect on commerce. The theory permits a Hobbs Act conviction when a defendant extorts money from a business, thereby reducing its ability to purchase goods or participate in interstate commerce. See e.g., United States v. Alexander, 850 F.2d 1500, 1503-04 (11th Cir.) (upholding a Hobbs Act conviction against a defendant whose extortion depleted the assets of a school board that customarily engaged in interstate commerce), vacated, 492 U.S. 915, 109 S. Ct. 3236, 106 L. Ed. 2d 584, amended and reinstated, 888 F.2d 777 (11th Cir. 1989).

commerce,[10] no court has converted the state crime of extortion into a federal matter simply by virtue of its size. If such a theory could provide a sufficient nexus to interstate commerce there would be no need to engage in the extensive analyses of how particular acts of extortion affected a victim's position in interstate commerce that are so prevalent in Hobbs Act cases. In <u>United States v. DiCarlantonio</u>, 870 F.2d 1058 (6th Cir. 1989), for example, the court reversed a Hobbs Act conviction even though the defendant received $30,000 from the FBI. The defendant's receipt of the money was insufficient to sustain the conviction because the court held that the money had no connection to interstate commerce.[11]  <u>Id.</u> at 1060-61; <u>United</u>

---

[10]  This court, for example, has suggested, in <u>dicta</u> and without the benefit of supporting authority, that a Hobbs Act prosecution may be appropriate if the sheer size of an extortion demand implies that the defendants' use of the funds could be expected to affect interstate commerce.  <u>See</u> <u>United States v. Farrell</u>, 877 F.2d 870, 875-76 (11th Cir. 1989) (defendants had demanded in excess of $1.5 million); <u>see also</u> <u>Collins</u>, 40 F.3d at 100 & n.21 (citing <u>Jund v. Town of Hempstead</u>, 941 F.2d 1271, 1285 (2d Cir. 1991)(affirming the Hobbs Act conviction of defendants who required a large number of victims to make political contributions in order to win and to retain public <u>employment</u>)).  We find such a result untenable, both on the facts of this case and as a matter of law.

[11]  The <u>DiCarlantonio</u> court, however, sustained the convictions for conspiracy to violate the Hobbs Act because the defendants in that case expected the extorted funds to come from a business

States v. Kaye, 593 F. Supp. 193, 196-99 (N.D. Ill. 1984) ("In plain English . . . [the indictment] charges an effect on interstate commerce *by the payment of money*, a contention on which there has been a failure of proof in . . . [jurisdictional] terms."); see also Collins, 40 F.3d at 99 (holding that the movement of a car, the proceeds of a robbery, in interstate travel was insufficient to support jurisdiction under the Hobbs Act).

The government's position also runs afoul of our requirement that the effect on commerce be adverse. See United States v. De Parias, 805 F.2d 1447, 1450 (11th Cir. 1986); see also United States v. Waters, 850 F. Supp. 1550, 1562 (N.D. Ala. 1994) (applying the rule). Although a few of our sister circuits have criticized our choice of words in De Parias,[12] the requirement of an adverse effect on

_____

engaged in interstate commerce. Id. at 1061-62.

[12] Perhaps most notably, the U.S. Court of Appeals for the Fourth Circuit has held that: "Although the word 'adverse' has been loosely used in expressing the effect on interstate commerce, such adverse effect is not an essential element of the crime that must be proved by the prosecution in a Hobbs Act case." United States v. Bailey, 990 F.2d 119, 126 ( 4th Cir. 1993). Compare United States v. Mattson, 671 F.2d 1020, 1024 (7th Cir. 1982) ("Even a beneficial effect on interstate commerce . . . is within the prohibition of the statute.") and United States v. Tormos-Vega, 959

17

commerce is consistent with the language of the statute and describes the typical Hobbs Act prosecution in which a defendant targets a business entity and thus hampers that victim's ability to engage in commerce. Instead, the government's argument focuses on an <u>increase</u> in interstate commerce arising out of the defendant's ability to spend the proceeds of the extortion scheme. Moreover, even if we were inclined to agree with the government's criticism of <u>De Parias</u>, "[t]he law in this circuit is emphatic that 'only a decision by this court sitting <u>en banc</u> or the United States Supreme Court can overrule a prior panel decision.'" <u>United States v. Woodard</u>, 938 F.2d 1255, 1258 (11th Cir. 1991) (per curiam) (quoting <u>United States v. Machado</u>, 804 F.2d 1537, 1543 (11th Cir. 1986)).

**CONCLUSION**

F.2d 1103, 1113 (1st Cir. 1992) (same) <u>with</u> <u>McLaughlin v. Anderson</u>, 962 F.2d 187, 194 (2d Cir. 1992)(requiring an adverse effect) <u>and</u> <u>United States v. Snyder</u>, 930 F.2d 1090, 1093 (5th Cir. 1991)(same).

We conclude that the government failed to establish the effect on commerce required to support a prosecution for extortion under the Hobbs Act. Our decision, however, hardly vindicates Kaplan, and we note that the State of Florida remains free to prosecute Kaplan on the facts of this case. <u>See</u> Fla. Stat. Ann. § 836.05 (defining the crime of extortion under Florida State law). Nevertheless, the evidence in this case does not support a federal prosecution under the Hobbs Act. Accordingly, we REVERSE his conviction.