33 F.3d 55
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Kenneth A. SELBY (93-1424), Thomas C. Dix (93-1451), Mark C.
Shinaberry (93-1455), Defendants-Appellants.
 Nos. 93-1424, 93-1451 and 93-1455.
 United States Court of Appeals, Sixth Circuit.
 Aug. 8, 1994.
 
 Before: MILBURN and BATCHELDER, Circuit Judges; and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendants-appellants Mark Shinaberry, Thomas Dix, and Kenneth Selby appeal from convictions on fraud charges stemming from their involvement with an advance fee scheme operated by DNS Financial Broker ("DNS"). DNS solicited customers by claiming the ability to procure large loans from non-conventional sources. DNS's customers were required to pay a hefty advance fee in order to fund the procurement process. Despite receiving at least $460,000 in advance fees, DNS never actually secured any loans for any customers; neither did DNS ever return to any customers the advance fees which they had paid. For the reasons that follow, we affirm the convictions and sentences of all defendants. However, with respect to the amount of restitution ordered by the district court, we remand to the district court for a recalculation and resentencing.
 
 I.
 A.
 
 2
 On February 6, 1991, a grand jury handed up a thirty-seven count indictment against six defendants: Douglas Shinaberry, Mark Shinaberry, Gail Shinaberry, Thomas Dix, Kenneth Selby, and James Pierson. Douglas Shinaberry, defendant Shinaberry's father, died on July 5, 1991; all charges against him were dismissed on August 5, 1991.
 
 
 3
 Of the remaining five defendants who had been charged in the original indictment, only four were named in a twenty-three count superseding indictment handed up on February 27, 1992. Gail Shinaberry, defendant Shinaberry's mother, was no longer charged in the case. After the resolution of pretrial motions, the case proceeded to trial on September 15, 1992.
 
 
 4
 The charges in the superseding indictment and the defendants' convictions thereon are as follows:[1]
 
 
 5
 -------------------------------------------------------------------------------
-------------------------------------------------------------------------------
 Count Charge Defendant/Verdict
-------------------------------------------------------------------------------
Count 1 Interstate transportation of money obtained Dix: guilty
 by fraud; aiding and abetting (18 U.S.C. Sec. Selby: guilty
 2314, Sec. 2) Shinaberry: not
 guilty
-------------------------------------------------------------------------------
Count 2 Wire fraud; aiding and abetting (18 U.S.C. Dix: guilty
 Sec. 1343, Sec. 2) Selby: guilty
 Shinaberry: not
 guilty
-------------------------------------------------------------------------------
Count 3 Interstate transportation of money obtained Dix: guilty
 by fraud; aiding and abetting (18 U.S.C. Sec. Selby: guilty
 2314, Sec. 2) Shinaberry: not
 guilty
-------------------------------------------------------------------------------
Count 4 Wire fraud; aiding and abetting (18 U.S.C. Dix: guilty
 Sec. 1343, Sec. 2) Selby: guilty
 Shinaberry: not
 guilty
-------------------------------------------------------------------------------
Count 5 Interstate transportation of money obtained Dix: guilty
 by fraud; aiding and abetting (18 U.S.C. Sec. Selby: guilty
 2314, Sec. 2) Shinaberry: not
 guilty
-------------------------------------------------------------------------------
Count 6 Wire fraud; aiding and abetting (18 U.S.C. Dix: guilty
 Sec. 1343, Sec. 2) Selby: guilty
 Shinaberry: not
 guilty
-------------------------------------------------------------------------------
Count 7 Interstate transportation of money obtained Dismissed
 by fraud; aiding and abetting (18 U.S.C. Sec.
 2314, Sec. 2)
-------------------------------------------------------------------------------
Count 8 Wire fraud; aiding and abetting (18 U.S.C. Dismissed
 Sec. 1343, Sec. 2)
-------------------------------------------------------------------------------
Count 9 Wire fraud; aiding and abetting (18 U.S.C. Dix: guilty
 Sec. 1343, Sec. 2) Selby: guilty
 Shinaberry: guilty
-------------------------------------------------------------------------------
Count 10 Wire fraud; aiding and abetting (18 U.S.C. Dix: guilty
 Sec. 1343, Sec. 2) Selby: guilty
 Shinaberry: guilty
-------------------------------------------------------------------------------
Count 11 Wire fraud; aiding and abetting (18 U.S.C. Dix: guilty
 Sec. 1343, Sec. 2) Selby: guilty
 Shinaberry: guilty
-------------------------------------------------------------------------------
Count 12 Wire fraud; aiding and abetting (18 U.S.C. Dix: guilty
 Sec. 1343, Sec. 2) Selby: guilty
 Shinaberry: guilty
-------------------------------------------------------------------------------
Count 13 Money laundering; aiding and abetting (18 Dix: guilty
 U.S.C. Sec. 1957, Sec. 2) Selby: guilty
 Shinaberry: guilty
-------------------------------------------------------------------------------
Count 14 Wire fraud; aiding and abetting (18 U.S.C. Dix: guilty
 Sec. 1343, Sec. 2) Selby: guilty
 Shinaberry: guilty
-------------------------------------------------------------------------------
Count 15 Money laundering; aiding and abetting (18 Dix: guilty
 U.S.C. Sec. 1957, Sec. 2) Selby: guilty
 Shinaberry: guilty
-------------------------------------------------------------------------------
Count 16 Wire fraud; aiding and abetting (18 U.S.C. Dix: guilty
 Sec. 1343, Sec. 2) Selby: guilty
 Shinaberry: guilty
-------------------------------------------------------------------------------
Count 17 Wire fraud; aiding and abetting (18 U.S.C. Dix: guilty
Sec. 1343, Sec. 2) Selby: guilty
 Shinaberry: guilty
-------------------------------------------------------------------------------
Count 18 Money laundering; aiding and abetting (18 Dix: guilty
 U.S.C. Sec. 1957, Sec. 2) Selby: guilty
 Shinaberry: guilty
-------------------------------------------------------------------------------
Count 19 Wire fraud; aiding and abetting (18 U.S.C. Dix: guilty
 Sec. 1343, Sec. 2) Selby: guilty
 Shinaberry: guilty
-------------------------------------------------------------------------------
Count 20 Money laundering; aiding and abetting (18 Dix: guilty
 U.S.C. Sec. 1957, Sec. 2) Selby: guilty
 Shinaberry: guilty
-------------------------------------------------------------------------------
Count 21 Money laundering; aiding and abetting (18 Dix: guilty
 U.S.C. Sec. 1957, Sec. 2) Selby: guilty
 Shinaberry: guilty
-------------------------------------------------------------------------------
Count 22 Wire fraud; aiding and abetting (18 U.S.C. Dix: guilty
 Sec. 1343, Sec. 2) Selby: guilty
 Shinaberry: guilty
-------------------------------------------------------------------------------
Count 23 Conspiracy to commit offenses against the Dix: guilty
 United States (18 U.S.C. Sec. 371) Selby: guilty
 Shinaberry: guilty
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
 
 
 6
 On March 12, 1993, the district court sentenced Dix to forty-one month concurrent prison terms on all counts of conviction. Selby was sentenced on March 12, 1993, to concurrent thirty-three month prison terms on all counts of conviction. Finally, on March 19, 1993, the district court sentenced Shinaberry to concurrent thirty-three month terms of imprisonment on Counts 9-23. All defendants were ordered to jointly and severally make restitution in the amount of $584,800
 
 B.
 
 7
 Douglas Shinaberry, deceased, was the owner and operator of DNS, which was incorporated on March 31, 1987. Mark Shinaberry, Thomas Dix, and Kenneth Selby served as vice presidents of DNS at various times. DNS solicited customers who needed financing for expensive or risky ventures that commercial banks and other traditional lenders would not fund. DNS offered to arrange financing in the form of "overborrow funding"; DNS clients were to request and receive more money than necessary, and the additional money was supposedly to be used to purchase an annuity from an insurance company in order to guarantee the principal of the original loan. Each DNS customer was required to pay a sizable fee before such funding would be arranged. The DNS clients were promised that their advance fees would be refunded in whole, or at least in part, if financing did not materialize.
 
 
 8
 The government presented testimony from six clients of DNS who tendered a total of $460,000 in advance fees, but never received either the promised loans or the refund of their advance fees. These clients and the amount of advance fees paid were: Bernard Epperson of Soil Technology Corp, ($80,000); Sandra Nicely of Nicely Boutique Shop, ($20,000); Raymond Berardinelli of Guardian Latex Corporation, ($200,000); Arthur Bressman of Arthur's Apparel Associates, Inc., ($50,000); Scott Wilshusen of Texas Southern Exploration Company, ($100,000); and, William Bittner of Community Recycling Corporation, ($10,000). Collectively, these six clients were promised $60,886,100 in loans.
 
 
 9
 DNS represented to these clients that funding would be provided by Zurich Overseas Bank, Ltd., ("ZOB") located in Plymouth, Montserrat, British West Indies. Mark Shinaberry purchased the ZOB on September 15, 1988 for $35,000.[2] Some of the advance fees were wired to an account at this bank at the direction of DNS. However, as it turned out, the ZOB was nothing more than the class B license and a fax machine in a bar in Montserrat called the Chez Nous.
 
 
 10
 When DNS clients called to check on the status of their financing, DNS employees often responded that the financing was in the works, and that the funds would soon be available. DNS never provided a single business loan to its clients.
 
 II.
 
 11
 The defendants raise numerous claims of error in relation to both their trial and the resulting sentences for their convictions. We will deal first with Mark Shinaberry's claims of error; next, with the issues raised by Kenneth Selby, and finally, with the errors alleged by Thomas Dix. There is some overlap of issues presented by the appellants, and it will be noted where a claim made by more than one defendant is discussed as to both or all defendants.
 
 A. Claims of Error: Mark Shinaberry
 1. Suppression of Shinaberry's Statement
 
 12
 Detective Richard Marston of Scotland Yard was assigned to Montserrat to investigate the activities of the large number of banks that had sprung up on the island. Among the complaints he received was one from the Texas Southern Exploration Company concerning the ZOB. The general nature of the complaint was that Texas Southern had attempted to secure financing for a project and had paid an advance fee to finance the loan, but received neither the loan nor the return of advance fee back.
 
 
 13
 Detective Marston's investigation eventually led to the arrest of defendant Shinaberry, and two other individuals, on an unrelated marijuana charge. Shinaberry was arrested on a Tuesday and spent the night of his arrest in a cell with one of the other individuals arrested and a local man. On the following morning, Shinaberry was taken before a magistrate and charged with possession of marijuana.
 
 
 14
 After his appearance before the magistrate, Shinaberry was questioned by Detective Marston and another detective from Scotland Yard about his activities with DNS. Shinaberry spoke with an attorney before he was questioned. After he spoke with his attorney, Shinaberry indicated that he was willing to go ahead with the questioning. Shinaberry was also informed of his rights, and that he did not have to answer any questions.
 
 
 15
 The statements given by Shinaberry during the questioning were exculpatory in nature. Shinaberry claimed that he was on Montserrat to lease a hotel and get it into operation. He disclaimed any knowledge of a wire transfer for $100,000 related to an advance fee for one of DNS's clients. Finally, Shinaberry specifically stated that he had no knowledge of any deal to provide Texas Southern with a loan.
 
 
 16
 Prior to trial, Shinaberry moved to suppress these statements. At the suppression hearing, Shinaberry gave his version of the events. Shinaberry testified that after he was arrested, a detective from Scotland Yard told him that if he cooperated they would be in a position to help him with the local authorities who took drug charges very seriously. Shinaberry also testified that the condition of the cell he was kept in was poor[3], and that after a local man who had been sharing his cell was taken away in the middle of the night, Shinaberry could hear people screaming at the local man to do push-ups and sit-ups, and it sounded like they might be beating him. Shinaberry testified that, overall, these conditions had him in fear of his life and that he cooperated with Detective Marston and the other detective from Scotland Yard because they acted like gentlemen and they represented that they could help him if he was cooperative.
 
 
 17
 Shinaberry claims that the statements he gave to the detectives in Montserrat were involuntary, arguing that promises of leniency were made to induce him to make those statements, and, given the totality of the circumstances surrounding his detention, that his will was overborne when he made them. The district court, however, found that the statements were voluntary and denied the motion. The district court specifically found that United States officials were in no way involved with Shinaberry's arrest or questioning; and, that there was nothing in the totality of the circumstances to indicate that Shinaberry's statements were anything other than completely voluntary.
 
 
 18
 The government initially argues that as a general proposition, "prophylactic constitutional rules designed to deter police misconduct do not apply to foreign police behavior." United States v. Wolf, 813 F.2d 970, 972 n. 3 (9th Cir.1987); Cf. Bram v. United States, 168 U.S. 532 (1897) (The Court assumed without discussion that the Fifth Amendment applied to a confession made by an American to police authorities of Halifax, Nova Scotia). Given the facts of the case before us, it is unnecessary to reach the issue of whether constitutional principles are per se applicable to actions of foreign police officers; because, even analyzed under the traditional constitutional framework, we conclude that Shinaberry's statements were voluntary.
 
 
 19
 This Court has held that "[w]hen a defendant asserts that a confession was coerced by a promise, the burden is on the Government to prove, by a preponderance of the evidence, that the confession was voluntary." United States v. Wrice, 954 F.2d 406, 410 (6th Cir.), cert. denied, 112 S.Ct. 2286 (1992). In determining the voluntariness of a statement, we will not disturb the trial court's findings concerning the factual circumstances surrounding the statement, unless clear error appears on the record. Id. 410-411. Nevertheless, it is the appellate court's duty independently to determine how the accused reacted to the events, and the legal significance of those reactions. Id. at 411.
 
 
 20
 The issue is whether the will of the accused has been overwhelmed by official pressure. [Citation omitted]. We consider the psychological impact on the accused by the totality of the circumstances of the confession, including the age of the accused, his level of education and intelligence, his physical condition and emotional state at the time of the confession, his expressed fears of violent reprisals, actual physical punishment, the proximity of the coerciveness of the confession as given, and the inherent coerciveness of the confession as given.
 
 
 21
 Id.
 
 
 22
 Applying the factors set forth in Wrice, we conclude that the statements given by Shinaberry to the detectives were voluntary. Shinaberry was twenty-five years old at the time of the questioning, he had attended community college and served as a vice-president of DNS. While Shinaberry did testify that he feared for his life, the record evidence simply does not support this assertion. Shinaberry was taken before a magistrate prior to his questioning, he was encouraged to confer with an attorney, who advised him to cooperate, he was informed that he was not obligated to answer any questions and he was also advised of other rights. And, importantly, he was not subjected to any abuse, mental or physical. Shinaberry also asserts that his statements were given in return for promises of help made by the detectives from Scotland Yard. Detective Marston testified that he made no representations of this sort to Shinaberry; however, he did not know if the other detective might have made such statements. Even assuming that Shinaberry's testimony is accurate in this respect, this exact situation was held by the Wolf court not to render a statement involuntary. 813 F.2d at 975. We likewise hold that, if true, this does not render Shinaberry's statements involuntary.
 
 
 23
 Also important is the fact that the district court found that Shinaberry chose to make exculpatory assertions that were false. As the district court noted:
 
 
 24
 "If [Shinaberry's] will was overborne, or had been overborne, he would certainly have given an abject confession and not attempted to hoodwink the Scotland Yard interview, as he did in this statement. So that itself belies his claim that he was terrified under the circumstances, and I must deny the motion to suppress.
 
 
 25
 The district court did not err in denying Shinaberry's motion to suppress his statements.
 
 2. Sufficiency of the Evidence
 
 26
 Shinaberry next asserts that the evidence produced at trial was insufficient to support his convictions on Counts 9-23 of the indictment. Shinaberry refers us to a statement made by the district court at the time the defendants' Rule 29 motions were denied:
 
 
 27
 THE COURT: Well, I think it's thin, but there is enough evidence there for a reasonable jury to conclude beyond a reasonable doubt that Mr. Shinaberry was part of the scheme to defraud, and there is ample evidence on Mr. Dix and Mr. Selby; Mr. Pierson there is sufficient.
 
 
 28
 Mr. Shinaberry is the thinnest, but there is enough there--
 
 
 29
 MR. MORGAN: Thank you, Your Honor.
 
 
 30
 THE COURT:--to take it to a jury. So the motions have to be denied.
 
 
 31
 It is Shinaberry's argument that what the district court characterized as the "thinnest" body of evidence was legally insufficient to sustain a conviction.
 
 
 32
 The government initially argues that Shinaberry did not reserve his right to challenge the sufficiency of the evidence since he did not renew his motion for acquittal after rebuttal testimony was presented in relation to one of Shinaberry's co-defendant's. We decline to address this issue, however, since even if Shinaberry did preserve the issue, the evidence was sufficient to support his conviction.
 
 
 33
 The government presented voluminous evidence connecting Shinaberry with the DNS fraud scheme. The government's proof indicated that Shinaberry was identified in DNS annual reports as a director and vice-president of DNS, and had full authority to act on behalf of DNS. He was one of only three people with access to the DNS checking account; and, he was identified on business cards as a member of DNS who specialized in various types of loans.
 
 
 34
 It was Shinaberry who purchased the ZOB for $35,000 in September 1988. Soon after Shinaberry acquired the ZOB, he sent James Pierson, bar owner and purported "Manager of International Affairs/Senior Vice President" of the bank, a fax machine that became the ZOB in Montserrat. Shinaberry took a trip to the island of Montserrat on April 24, 1989, accompanied by John Garibay, who was listed on ZOB letterhead as "General Manager/Senior Vice-President." While on this trip, Shinaberry sent his father daily dispatches that indicated that he was familiar with DNS's loan clients.
 
 
 35
 Shinaberry also contends that he had no substantive relationship or contact with any of DNS's clients who were defrauded of their advance fees. This assertion, however, is undercut by evidence in the record. Arthur Bressman, one of DNS's clients who attempted to procure a loan, testified that on some of the numerous occasions he called to ascertain the status of his application, Shinaberry answered the phone and made representations to the effect that he had heard Bressman's loan was moving along, and that it was coming towards a culmination. In addition, the government offered evidence to show that Shinaberry routinely wired advance fees from the ZOB in Montserrat to a DNS account in Michigan.
 
 
 36
 In the face of this evidence, we simply cannot accept Shinaberry's characterization of his duties as performing no more than "certain menial tasks for his father." The evidence proves that Shinaberry was integrally involved in setting the groundwork for the scheme to defraud, and in addition, took part in the furtherance of the scheme. Thus, even assuming that this issue was preserved for our review, it is clear that viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime to exist beyond a reasonable doubt. United States v. Ellzey, 874 F.2d 324, 328 (6th Cir.1989).
 
 
 37
 3. Admission of Shinaberry's Redacted Statement
 
 
 38
 At trial, the government sought to introduce in its entirety the statement made by Shinaberry to the Scotland Yard detectives in Montserrat. As Detective Marston read the statement to the jury, however, co-defendants Dix and Pierson objected to the introduction of the complete statement because parts of it, according to these co-defendants, implicated them. The co-defendants claimed that the introduction of the statement would incriminate them as to their roles in the DNS scheme, thus violating Bruton v. United States, 391 U.S. 123 (1968). A side-bar discussion ensued, and the district court determined that a redacted version of the statement would be admissible. After the redactions were made, the statement was read to the jury. None of the defendants objected to the reading of the redacted statement.
 
 
 39
 On the following day, the government moved to reopen direct examination of Detective Marston for the purpose of admitting into evidence a Corporate Memo (the "Memo") sent by Shinaberry to his father, on April 25, 1989. The Memo makes specific reference to Texas Southern, one of the victims of the fraud scheme.[4] Shinaberry objected to the introduction of the Memo on the grounds that it rendered the redacted statement, introduced the day before, unfair and misleading. Specifically, Shinaberry wanted to present his entire unredacted statement to the jury because in his statement Shinaberry indicates that the reference to Texas Southern in the Memo was put there by co-defendant Dix.[5] As a result, the government was "whipsawed" between Shinaberry's desire to introduce the unredacted statement and the other defendants' Bruton objections. The district court ruled the Memo admissible, and did not allow Shinaberry to introduce his unredacted statement.
 
 
 40
 We review the district court's rulings on evidence for abuse of discretion. United States v. Bonds, 12 F.3d 540, 554 (6th Cir.1993). Shinaberry is essentially arguing that the "doctrine of completeness," as found in Fed.R.Evid. 106,[6] required the court to admit the portion of his statement that attributed to his co-defendant, Dix, the reference in the Memo to Texas Southern. However, we conclude that Shinaberry was not entitled to have the exculpatory comment concerning the Memo admitted since the redacted statement contained no reference whatsoever to the Memo. See United States v. Marin, 669 F.2d 73 (2nd Cir.1982). Thus, the unredacted statement was not in fairness required to make complete the portions of the statement that were introduced into evidence. The district court did not abuse its discretion in holding the Memo admissible and the unredacted statement inadmissible.
 
 4. Admission of the Bank Records
 
 41
 Shinaberry's next assignment of error is that the district court committed reversible error when, during the cross-examination of Gail Shinaberry, it refused to exclude records of DNS deposits of client monies. Shinaberry argues that the district court's refusal to exclude these records allowed the government to introduce evidence without any evidentiary foundation "thereby leaving only the prejudicial innuendo or impression that the monies were obtained by way of the same kind of alleged fraudulent scheme." Shinaberry apparently considers the admission of these bank records to be impermissible evidence of other crimes, acts, or wrongs.
 
 
 42
 The government, on the other hand, argues that the records of the deposits were properly admitted as evidence of Gail Shinaberry's bias. The government argues that since Gail Shinaberry is the wife and mother of defendants named in the original indictment, and was herself a former participant in the DNS operation, her bias and credibility were proper matters for exploration.
 
 
 43
 The district court, in denying the Shinaberry's motion stated,
 
 
 44
 I don't think it would be similar acts. I don't think--even if your [sic] arguing that this is similar-acts evidence, it is not because there is a conspiracy charged in here.
 
 
 45
 And the Court is going to have to deny the motion. This is admissible not only as to her credibility, but for the purposes the government argues [bias].
 
 
 46
 "The trial court's determinations of admissibility and relevancy depend on the exercise of sound judgment within the context of the entire trial. [Citation omitted]. The trial court's determination should not be disturbed absent a clear abuse of discretion." United States v. Seago, 930 F.2d 482, 494 (6th Cir.1991). Additionally, the trial court's rulings on the scope of cross-examination are also committed to the court's discretion. See United States v. Moore, 917 F.2d 215, 222 (6th Cir.1990), cert. denied, 499 U.S. 963 (1991).
 
 
 47
 After carefully reviewing the record, we conclude that the district court did not abuse its discretion in allowing the records of the deposits into evidence. Even though it was undisputed that Gail Shinaberry actually made the deposits in question, she repeatedly claimed that she "did not recall," or "did not remember" any of the particulars of these transactions. As a result of the government's cross-examining Gail Shinaberry and confronting her with the numerous records of the deposits that she had made, she eventually conceded that DNS had received money from clients seeking funding. As found by the district court, this evidence was relevant and admissible as to her credibility and to show her bias in favor of the defendants.
 
 
 48
 5. U.S.S.G. Sec. 3B1.2.
 
 
 49
 At sentencing, Shinaberry argued that he was significantly less culpable than the other participants in the scheme, and was therefore entitled to a decrease in his offense level pursuant to U.S.S.G. 3B1.2. Shinaberry contended that his title of vice president was essentially meaningless, and that he performed only menial tasks for his father. Shinaberry also argued that he was readily distinguishable from the other participants in the scheme due to his age, lack of education, lack of maturity, lack of life-experience, and lack of business acumen.
 
 
 50
 The district court expressly found that Shinaberry was not a minor participant. We must affirm this ruling unless we find that it is clearly erroneous. We do not. As related in our discussion of Shinaberry's allegation of insufficiency of the evidence to support his convictions, the record reflects that Shinaberry played a substantial role in the furtherance of DNS's loan fraud scheme. Therefore, we cannot find that the district court erred by refusing to decrease his offense level.
 
 B. Claims of Error: Kenneth Selby
 1. Ineffective Assistance of Counsel
 
 51
 Selby asserts, for the first time on appeal, that his trial counsel was ineffective. It is a well established rule that this Court "will not review an ineffective assistance of counsel claim that is raised for the first time on appeal." United States v. Straughter, 950 F.2d 1223, 1234 (6th Cir.1991), cert. denied, 112 S.Ct. 1238 and 1505 and 1601 (1992); United States v. Martin, 920 F.2d 345, 349 (6th Cir.1990), cert. denied, 500 U.S. 926 (1991). This Court has instead recognized that such claims "are best brought by a defendant in a post-conviction proceeding under 28 U.S.C. Sec. 2255," where parties "can develop an adequate record on the issue." United States v. Daniel, 956 F.2d 540, 543 (6th Cir.1992). We find that there is no reason presented in this case to make an exception to our rule; therefore we decline to entertain this assignment of error.
 
 2. Evidence Of Selby's Disbarment
 
 52
 Selby argues that the introduction of evidence concerning his disbarment from the State of Colorado's bar in 1979 was reversible error. This evidence was introduced by the government in relation to testimony from a DNS client that Selby had been introduced to him by Douglas Shinaberry as a corporate attorney for DNS. Selby argues that Shinaberry's statement was hearsay, and that introduction of the evidence of disbarment violated Federal Rule of Evidence 609.
 
 
 53
 We reject both of these arguments. An out-of-court statement is only hearsay if it is offered to prove the truth of the matter asserted. Fed.R.Evid. 801(c). Here, the statement was offered to prove the falsity of the matter asserted. This Court has held "that statements offered to prove the falsity of the matter asserted are not hearsay." United States v. Hathaway, 798 F.2d 902, 905 (6th Cir.1986). Selby's reliance on Rule 609, which disallows the use of a limited class of prior convictions for impeachment purposes, is completely misplaced; Selby's disbarment was not a prior conviction, and the evidence was not being used to impeach a witness. The district court did not err in admitting the evidence of Selby's disbarment.
 
 C. Claims of Error: Thomas Dix
 
 54
 thomas Dix presented a defense at trial in which he testified on his own behalf. Dix testified that during the course of attempting to develop a swim park he and his partner were looking for financial assistance and met Douglas Shinaberry. Dix was eventually asked to work for DNS, which he agreed to do. Dix said that he talked to DNS customers and disseminated information given to him by Douglas Shinaberry. Dix further asserted that he was aware of a relationship between DNS and two other financial organizations, and communications between them concerning monies to be used to fund DNS's promised loans.
 
 
 55
 1. Business Records Exception to the Hearsay Rule
 
 
 56
 At trial, Dix attempted to introduce large quantities of records from DNS. These records purportedly contained numerous communications between DNS and Grayson Financial, and DNS and Roger Conway-Hyde. According to Dix, these communications concerned efforts to obtain a large loan for DNS and were crucial to his defense. Dix attempted to have these records admitted into evidence pursuant to the business records exception to the hearsay rule. Fed.R.Evid. 803(6). The business records exception is available only where the following conditions are met:
 
 
 57
 [The record] (1) [M]ust have been made in the course of a regularly conducted business activity; (2) it must have been kept in the regular course of that business; (3) the regular practice of that business must have been to have made the memorandum; and (4) the memorandum must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge.
 
 
 58
 United States v. Fawaz, 881 F.2d 259, 266 (6th Cir.1989) (quoting Redken Laboratories v. Levin, 843 F.2d 226, 229 (6th Cir.), cert. denied, 109 S.Ct. 137 (1988)). In addition, Rule 803(6) requires that a foundation be laid by the "custodian or other qualified witness."
 
 
 59
 In the instant case, Dix attempted to introduce two sets of records using two witnesses: Gail Shinaberry and Jefferey Black. Dix argues that Mrs. Shinaberry's testimony established that she was an individual familiar with the record keeping at DNS, and was thus a proper foundation witness for the introduction of the business records. However, the district court disagreed, finding that Mrs. Shinaberry "has testified that she was not the custodian or didn't know the methodology of the custodian--you're asking that 300 documents be received as business records from a totally unfamiliar witness as loose sheets of paper not from the business."
 
 
 60
 After careful review of Mrs. Shinabery's testimony, we are constrained to agree with the district court and find that it did not abuse its discretion. The testimony of Gail Shinaberry was equivocal and arguably self-serving. In response to defense counsel's queries regarding the procedures involved in the keeping of DNS's records, Mrs. Shinaberry readily agreed to every statement made by defense counsel. Conversely, her responses to government counsel were a nearly uninterrupted string of "I don't knows" and "I don't recalls." The standard for knowledge required of a foundation witness is very liberal in this circuit: "When a witness is used to lay the foundation for admitting records under Rule 803(6), all that is required is that the witness be familiar with the record keeping system." United States v. Hathaway, 798 F.2d 902, 906 (6th Cir.1986); accord Dorsey v. Detroit, 858 F.2d 338, 342 (6th Cir.1988). Nevertheless, Mrs. Shinaberry's testimony is so full of inconsistencies that it cannot be determined whether she was in fact familiar with DNS's records keeping system. If the foundation requirement of Rule 803(6) is to have any meaning, the foundation witness must have some independent knowledge of the methodology employed in the keeping of the business records; it is not sufficient that he or she simply make affirmative replies to a defense counsel's leading questions. Thus, we cannot find that the district court abused its discretion in refusing to admit this evidence.[7]
 
 
 61
 Dix also sought to have another set of records introduced through the testimony of Jefferey Black. These records were documents received from Grayson Financial, addressed to Black and DNS, and kept by Black in the ordinary course of his business. The government objected to the introduction of these documents as business records, and the district court initially overruled the objection. However, the court later changed its mind, concluding: "The document was not generated in the course of his business by a person responsible for knowing what is therein."
 
 
 62
 Two circuits which have addressed this issue support the district court's ruling that a document must be generated in the course of the foundation witness's business in order to be admissible. In Belber v. Lipson, 905 F.2d 549 (1st Cir.1990), the First Circuit concluded that similar evidence was inadmissible. In Belber, a medical malpractice action, medical records of one doctor were in the possession of another doctor. The district court refused to admit these records into evidence, and the Belber court affirmed, reasoning "[t]he mere custody by Conway of the medical records of another doctor does not incorporate them into Conway's business records." Id. at 552. A similar result was reached in NLRB v. First Termite Control Co., 646 F.2d 424 (9th Cir.1981). In First Termite, the court held that a freight bill produced by one company, and kept in the records of another company could not be admitted under Rule 803(6) when the foundation witness was not from the company that produced the record in the first instance. In finding the records inadmissible, the First Termite court concluded that, "[i]t is clear ... that the witness ... had no knowledge as to how the records were prepared nor any knowledge as to the manner in which the factual information was placed in the records...." Id. at 428.
 
 
 63
 Similarly, in the present case, Black merely possessed copies of letters, with no personal knowledge of the information used to prepare them. These letters were not prepared by Black in the regular course of his business; thus, the district court correctly held that the communications received by Black were not business records admissible under Rule 803(6).[8]
 
 2. Access to Brady Material
 
 64
 Dix's next allegation of error is also advanced by Selby. Prior to trial, Dix filed a Motion to Compel Disclosure of Exculpatory Evidence including any documents related to a government investigation of Grayson Financial and Anthony Moschitta, a former employee of Grayson Financial. In response to this motion, the government presented the defendants with all of the material developed during their investigation of Grayson Financial in Seattle, Washington. Shortly before the trial began, Dix, who had heard that Moschitta had become a government witness, requested that the court order the government to turn over any reports of interviews with Moschitta, which Dix speculated must have been generated subsequent to the first disclosure of documents. The government responded that it believed any information relating to whether Grayson Financial defrauded clients other than DNS was irrelevant to the issue of whether DNS defrauded its clients. After being reminded by the district court of its continuing obligation to turn over exculpatory evidence, the government affirmatively stated that it possessed no such material. The government also made it clear that Mr. Moschitta was available as a defense witness, and it would do everything within its power to insure that Mr. Moschitta responded to a defense subpoena. The defendants chose not to call Mr. Moschitta during the trial.
 
 
 65
 The district court denied Dix's Motion To Compel, stating: "Well, the motion is denied. It seems clear that the government is aware of its obligation, and the fact that Moschitta was a fraud doesn't negate the possibility here that the defendants here were also frauds. I don't see that anything that he might have said was ipso facto exculpatory."
 
 
 66
 The basis for the defendants' assertion that the government failed to turn over exculpatory evidence is no more than speculation and presumption. The defendants repeatedly assert that "presumably" Moschitta would have made statements exculpatory to them, or that they "assume" that he had explained that Grayson defrauded DNS along with others. In United States v. Driscoll, 970 F.2d 1472 (6th Cir.1992), cert. denied, 113 S.Ct. 1056 (1993), this Court rejected a similar demand for alleged Brady material, holding:
 
 
 67
 Mere speculation that a government file may contain Brady material is not sufficient to require a remand for in camera inspection, much less reversal for a new trial. A due process standard which is satisfied by mere speculation would convert Brady into a discovery device and impose an undue burden upon the district court.
 
 
 68
 Id. at 1482 (quoting United States v. Andrus, 775 F.2d 825, 843 (7th Cir.1985)); accord United States v. Todd, 920 F.2d 399, 405 (6th Cir.1990) ("the Brady rule is not an evidentiary rule which grants broad discovery powers to a defendant...."). The district court did not err in denying Dix's general and unsubstantiated request for hypothetical Brady material.
 
 3. The Rebuttal Witness
 
 69
 Dix, who testified in his own defense, made two assertions with respect to his role in the DNS fraud scheme. First, Dix testified that his company, DS Investments, performed only legitimate tax preparation services. Second, Dix asserted that he had never defrauded anyone and that he believed his work with DNS was completely legitimate. The government offered Lloyd Pankey's testimony in rebuttal to show that DS engaged in activities besides the preparation of tax returns, and to show that Dix made false representations to Pankey concerning disbursement of funds. Dix contends that the testimony of Pankey was irrelevant, not in rebuttal to anything offered by the defense, outside the scope of the government's theory of prosecution, and contrary to the rules of evidence. We disagree.
 
 
 70
 "A trial court has considerable discretion in determining the proper scope of rebuttal evidence." United States v. Goodwin, 770 F.2d 631, 638 (7th Cir.1985), cert. denied, 474 U.S. 1084 (1986). This Court has held that the district court's "determinations regarding the order of proof and scope of rebuttal testimony will not be disturbed absent an abuse of discretion." Benedict v. United States, 822 F.2d 1426, 1428 (6th Cir.1987). The district court did not abuse its discretion in allowing this testimony to rebut assertions made by Dix in his testimony.[9]
 
 4. U.S.S.G. Sec. 2S1.1(b)(2)
 
 71
 Dix claims that the district court erred by increasing his offense level by one point because, he asserts, the value of the funds laundered did not exceed $100,000, as contemplated by U.S.S.G. Sec. 2S1.2(b)(2). Dix is correct in claiming that the aggregate amount of the unlawful transactions attributable to his "money laundering" convictions (Counts 13, 15, 18, 20, 21) is only $77,000. However, the government argued at sentencing that there was evidence introduced at trial of numerous smaller transactions that were properly aggregated with the amounts directly attributable to the offenses of conviction. The district court agreed with the government's arguments, and overruled Dix's objections: "I have to deny the objection because the total amount of the money laundering just from the exhibits introduced here does exceed the hundred thousand." We will not disturb this finding unless we find it to be clearly erroneous. United States v. Tansley, 986 F.2d 880, 884 (5th Cir.1993).
 
 
 72
 We find that the view taken by Dix is too narrow an interpretation of the Sentencing Guidelines. Section 2S1.2(b)(2) provides that "[i]f the value of the funds exceeded $100,000, increase the offense level as specified in Sec. 2S1.1(b)(2)." The question we are presented with is what is intended by "value of the funds" within this section. We look for guidance to Sec. 1B1.3 of the Sentencing Guidelines. As held by this Court in United States v. Kappes, 936 F.2d 227, 229 (6th Cir.1991),
 
 
 73
 [t]he goal of the relevant conduct provision is to allow a court to impose sentences commensurate with the gravity of the offense. Section 1B1.3(a)(2) of the Guidelines states that the base offense level "shall be determined on the basis of ... all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction."
 
 
 74
 As such, the total amount of the advance fee proceeds wired From Zurich Overseas Bank in Montserrat to the DNS account in Michigan is a permissible basis for calculating the value of the funds. Obviously, "[i]n order to comport with due process requirements ... proof of the relevant conduct should be 'supported by some minimal indicium of reliability beyond mere allegation.' " Kappes, 936 F.2d at 229 (quoting United States v. Smith, 887 F.2d 104, 109 (6th Cir.1989)). The evidence presented at trial established that the amount of funds actually laundered was well over $100,000. As a result, the district court correctly held that the "value of the funds" was over $100,000, and correctly increased Dix's offense level by one point pursuant to Sec. 2S1.2(b)(2).
 
 5. The Obstruction of Justice Enhancement
 
 75
 Dix next contends that he should not have received a two-point enhancement for obstruction of justice because the district court failed to make a clear finding with respect to the falseness of Dix's testimony.
 
 
 76
 The sentencing guidelines provide that: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." U.S.S.G. Sec. 3C1.1.
 
 
 77
 The Supreme Court has recently provided guidance as to what findings a district court must make before imposing an obstruction enhancement. In United States v. Dunnigan, 113 S.Ct. 1111 (1993), the alleged obstruction of justice involved perjury by a testifying defendant as is the case here. The principal issue before the Court was the constitutionality of an enhancement based on trial perjury. The Fourth Circuit had found such an enhancement to be unconstitutional. The Supreme Court reversed and held that perjury committed by a testifying defendant would clearly constitute an obstruction of justice. Id. at 1114-15.
 
 
 78
 In an effort to allay the fears of the Fourth Circuit that every guilty verdict in a case in which the defendant had testified would result in an obstruction of justice enhancement, the Court laid down some guidelines for district judges:
 
 
 79
 Of course, not every accused who testifies at trial and is convicted will incur an enhanced sentence under Sec. 3C1.1 for committing perjury. As we have just observed, an accused may give inaccurate testimony due to confusion, mistake or faulty memory. In other instances, an accused may testify to matters such as lack of capacity, insanity, duress or self-defense. Her testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent. For these reasons, if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same.... (citations omitted). When doing so, it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding. The district court's determination that enhancement is required is sufficient, however, if, as was the case here, the court makes a finding of an obstruction or impediment of justice that encompasses all of the factual predicates for a finding of perjury.
 
 
 80
 Dunnigan, 113 S.Ct. at 1117.
 
 
 81
 This Court recently addressed the Dunnigan decision in Mathews v. United States, 11 F.3d 583 (6th Cir.1993). There, the trial court applied an obstruction enhancement after stating: "[T]he Court will abide by the jury's verdict in the decision as to whether the statement of the Defendant as to the nature of the transaction was true or not...." Id. at 587. This Court vacated the defendant's sentence "not because of the paucity of the judge's findings, but because the record reflects he deferred to the jury rather than making a finding on his own." Id. In the case at bar, the trial judge stated in part:
 
 
 82
 I do find that Mr. Dix perjured himself on the stand here in the course of his trial.... His testimony was false in several respects, including the respect that Mr. Robinson has called to this Court's attention. So I will give him the enhancement that appears to be mandated by law....
 
 
 83
 This is clearly an independent determination on the part of the trial judge that the defendant committed perjury, and that the obstruction enhancement was therefore justified. This finding comports with the standards laid out by the Supreme Court in Dunnigan, and interpreted by this Court in Mathews. As a result, it was proper for the district court to impose the two level obstruction enhancement.
 
 
 84
 D. Joint Claims of Error: Shinaberry, Dix, and Selby
 
 1. Cumulative Errors In The Trial
 
 85
 All three defendants claim that errors in the trial "cumulatively coalesce" to violate their rights under the due process clause and concepts of fundamental fairness. Lundy v. Campbell, 888 F.2d 467, 481 (6th Cir.1989), cert. denied, 495 U.S. 950 (1990). To the extent that defendants reallege allegations of error already discussed, supra, as underlying their claims that fundamental fairness was violated, there will be no further discussion. This leaves us with two additional claims to consider.
 
 
 86
 With regard to the due process issue, Dix alleges that a question the government asked during the cross-examination of his character witness Denise Claren, was so inflammatory and prejudicial that it should have served as the basis for a mistrial; and in the alternative, was so unfair as to permeate the overall trial and require reversal. The incident to which Dix refers is as follows:
 
 
 87
 Q: Have you ever known anybody by the name of Larry Kitchen?
 
 
 88
 A: No, sir.
 
 
 89
 Q: Had you ever heard reputed in the community that Mr. Dix stole 11,000 dollars from Larry Kitchen.
 
 
 90
 A: No.
 
 
 91
 At this point, Dix's attorney objected and requested a mistrial. The district court denied the mistrial, but stated: "Well, I'm gonna strike the question and sustain the objection...." The court then instructed the jury that, "the last question is stricken and is to be disregarded." We cannot agree that this single event requires the reversal of his conviction. This was a single question asked in a sixteen-day trial, and the jury was advised that the question was to be stricken and disregarded. This incident simply does not rise to the level of a due process violation.
 
 
 92
 The next claim made by the defendants is that the admission of statements made by co-defendant James Pierson, who did not testify at trial, created a Bruton problem as to his co-defendants. The government sought to introduce, through the testimony of Special Agent Troccoli, statements made by Pierson to the effect that DNS had defrauded its clients of their money. The defendants vigorously objected, and the trial court ruled that the statement could only be introduced to the extent that Pierson stated he was not aware that DNS had ever actually funded a loan. During the government's direct, Agent Troccoli testified that "Mr. Pierson stated that he knew he was not a legitimate vice-president of a bank, and he felt his name was being used to deceive others." Defendants eventually objected, and renewed their motions for separate trials. The district court denied defendants' motions stating, "he [Pierson] does implicate others, but the fact that other evidence connecting the others is necessary relieves the Bruton problem." Defendants disagree, claiming that this statement was clearly inculpatory as to them, and therefore a violation of Bruton.
 
 
 93
 The Supreme Court held in Bruton "that a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial." Richardson v. Marsh, 481 U.S. 200, 201 (1987). In United States v. DiCarlantonio, 870 F.2d 1058, 1062 (6th Cir.), cert. denied, 493 U.S. 933 (1989), this Court, interpreting Richardson, held: "Bruton does not bar the use of a codefendant's confession if it is redacted to omit any references to the defendant's name or existence, even if the codefendant's confession becomes incriminating when linked with other evidence adduced at trial."
 
 
 94
 In this case, there is no direct reference to any of the defendants. The statement, introduced through Troccoli, merely dealt with Pierson's impression of the legitimacy of the Zurich Overseas Bank. This case is very similar to DiCarlantonio, supra, which held that a co-defendant's confession may be introduced so long as it is "redacted to exclude statements which clearly incriminated" the complaining defendant. The DiCarlantonio court, following Richardson, held that this was so "even if the codefendant's confession becomes incriminating when linked with other evidence adduced at trial." 870 F.2d at 1062. Thus, because the statement as heard by the jury did not mention any defendant, or even DNS, and it is incriminatory only when linked with other evidence adduced at trial, it was properly admitted.
 
 
 95
 In sum, we hold that the alleged errors committed at trial did not cumulatively violate the due process rights of any or all of the defendants.
 
 2. The Amount of Restitution
 
 96
 The district court, guided by various presentence reports, ordered Shinaberry, Selby, and Dix to make restitution, jointly and severally, in the amount of $584,800. All three defendants challenge this finding on two grounds: First, that the district court improperly calculated the amount of restitution due; and second, that the district court failed to make any determination of their ability to pay such an amount before imposing it.
 
 
 97
 This Court has held that the amount of restitution must be limited to the amount of loss caused by the specific conduct that forms the basis for the offenses of conviction. United States v. Jewett, 978 F.2d 248, 250-252 & n. 3 (6th Cir.1992); United States v. Streebing, 987 F.2d 368, 373-376 (6th Cir.), cert. denied, 113 S.Ct. 2933 (1993). Thus the greatest amount of restitution that the defendants can be ordered to pay is $460,000, the amount attributable to the offenses of conviction.
 
 
 98
 The district court ordered restitution pursuant 18 U.S.C. Sec. 3664(a) which provides:
 
 
 99
 The court, in determining whether to order restitution under section 3663 of this title and the amount of such restitution, shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.
 
 
 100
 Defendants argue that the district court failed to consider their present or future ability to pay an order of restitution. This Court has specifically held that "indigency is not a bar to an order of restitution," United States v. Purther, 823 F.2d 965, 970 (6th Cir.1987), and that a "defendant's ability to pay is only one factor to be considered in an order of restitution." United States v. Miller, 900 F.2d 919, 925 (6th Cir.1990). Several circuits have also held that restitution properly may be based upon a defendant's future earning capacity.[10] Defendants argue, however, that the record, including the presentence report, does not contain any evidence of their ability to make restitution, and the sentencing judge did not make any findings in regard to that factual issue.
 
 
 101
 We note that none of the defendants objected to the order of restitution at sentencing. However, since the amount of restitution imposed upon the defendants was incorrect, and we must therefore remand this case to the district court on that determination, we instruct the district court to consider, in determining the amount of restitution to be imposed, the defendants' ability, including future ability, to pay such restitution.
 
 III.
 
 102
 For the above reasons, we AFFIRM the convictions of all defendants. We also AFFIRM the sentences of all defendants except as to the amount of restitution, and REMAND to the district court for resentencing only as to the amount of restitution.
 
 
 
 [1]
 Co-defendant James L. Pierson was acquitted on all counts, and is not a party to this appeal
 
 
 [2]
 Montserrat, a 39-square-mile island in the Caribbean about 28 miles west of Antigua, is a British-dependent territory populated by about 10,000 residents. Mark Shinaberry also purchased a class B banking license from the government of Montserrat. A class B license is a restricted license issued to off-shore banks that does not entitle the holder to deal in the currency of Montserrat
 
 
 [3]
 Specifically, Shinaberry said, "Yes sir, there was lots of bugs. Mice. I don't know if there were rats or not. I seen mice. It was terrifying, to say the least."
 
 
 [4]
 The Memo provides in pertinent part:
 RE: Texas Southern
 In the morning Jim [Pierson] is going to talk with Michael Roe about that last communication From Texas Southern. (Roe frequents his restaurant according to Jim).
 
 
 [5]
 The portion of his statement to which Shinaberry refers is as follows:
 Q: Another memo dated 25/4/89 is from you to Douglas and John Shinaberry. The writing in the second paragraph concerns Texas Southern. I hand you the memo. What does that mean to you?
 (Shinaberry reads the memo)
 A: The whole message is from me, but that part of it is from Tom Dix.
 
 
 [6]
 Fed.R.Evid. 106 provides:
 When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.
 
 
 [7]
 The government also points out that these documents were not found in the search of DNS's offices, but came from a large collection of records which mysteriously appeared at the law offices of defendant Pierson's attorney shortly before the original trial date in this case. This fact obviously affects the trustworthiness of this evidence; however, since we find the evidence inadmissible for lack of foundation, we decline to address this argument
 
 
 [8]
 Dix complains that the district court applied different standards to the records he desired admitted, and the records of a government witness admitted as business records. However, the situation with respect to Sandra Nicely is distinguishable because the communications were prepared by her agents, in the regular course of their business, and not by an unrelated third-party
 
 
 [9]
 We also reject Dix's contentions that Pankey's testimony was outside the permissible scope of rebuttal, was addressed to a collateral matter, or violated the parol evidence rule
 
 
 [10]
 See United States v. Rogat, 924 F.2d 983 (10th Cir.), cert. denied, 499 U.S. 982 (1991); United States v. Paden, 908 F.2d 1229, 1237 (5th Cir.1990), cert. denied, 498 U.S. 1039 (1991); United States v. McClellan, 868 F.2d 210, 213 (7th Cir.1989); United States v. Brown, 744 F.2d 905, 911 (2d Cir.), cert. denied, 469 U.S. 1089 (1984)